## FRANK *v.* MARYLAND.

No. 278. Argued March 5, 1959.—Decided May 4, 1959.

*Benjamin Lipsitz* argued the cause and filed a brief for appellant.

*C. Ferdinand Sybert,* Attorney General of Maryland, and *James H. Norris, Jr.,* Special Assistant Attorney General, argued the cause for appellee. With them on the brief were *Hugo A. Ricciuti* and *W. Thomas Gisriel.*

A brief urging affirmance was filed for the Member Municipalities of the National Institute of Municipal Law Officers, as *amici curiae,* by *Joe W. Anderson, Roger Arnebergh, John C. Banks, Alexander G. Brown, Nathaniel H. Goldstick, William N. Gurtman, Claude V. Jones, Ralph S. Locher, Walter J. Mattison, John C. Melaniphy, Barnett I. Shur, Charles H. Tenney, Charles S. Rhyne, Brice W. Rhyne* and *S. White Rhyne, Jr.*

Mr. Justice Frankfurter delivered the opinion of the Court.

Acting on a complaint from a resident of the 4300 block of Reisterstown Road, Baltimore, Maryland, that there were rats in her basement, Gentry, an inspector of the Baltimore City Health Department, began an inspection of the houses in the vicinity looking for the source of the rats. In the middle of the afternoon of February 27, 1958, Gentry knocked on the door of appellant's detached frame home at 4335 Reisterstown Road. After receiving no response he proceeded to inspect the area outside the house. This inspection revealed that the house was in an "extreme state of decay," and that in the rear of the house there was a pile later identified as "rodent feces mixed with straw and trash and debris to approximately half a ton." During this inspection appellant came around the side of the house and asked Gentry to explain his presence. Gentry responded that he had evidence of rodent infestation and asked appellant for permission to inspect the basement area. Appellant refused. At no time did Gentry have a warrant authorizing him to enter. The next forenoon Gentry, in the company of two police officers, returned to appellant's house. After receiving no response to his knock, he reinspected the exterior of the premises. He then swore out a warrant for appellant's arrest alleging a violation of § 120 of Art. 12 of the Baltimore City Code. That section provides:

> "Whenever the Commissioner of Health shall have cause to suspect that a nuisance exists in any house, cellar or enclosure, he may demand entry therein in the day time, and if the owner or occupier shall refuse or delay to open the same and admit a free examination, he shall forfeit and pay for every such refusal the sum of Twenty Dollars."

Appellant was arrested on March 5, and the next day was found guilty of the offense alleged in the warrant by a Police Justice for the Northern District of Baltimore and fined twenty dollars. On appeal, the Criminal Court of Baltimore, in a *de novo* proceeding, also found appellant guilty. The Maryland Court of Appeals denied certiorari. The case came here under a challenge, 28 U. S. C. § 1257 (2), to the validity of § 120 to determine whether appellant's conviction for resisting an inspection of his house without a warrant was obtained in violation of the Fourteenth Amendment.

The Health Code of the City of Baltimore, of which § 120 is an important part, deals with many of the multiform aspects of hygiene in modern urban areas. A vital portion concerns the hygiene of housing. Typical of the content and method of enforcing its provisions is the section requiring that "[e]very dwelling and every part thereof shall be kept clean and free from any accumulation of dirt, filth, rubbish, garbage or similar matter, and shall be kept free from vermin or rodent infestation." Baltimore City Code, Art. 12, § 112. If the occupant of a building fails to meet this standard, he is notified by the Commissioner of Health to abate the substandard conditions.[1] Failure to remove these hazards to community health gives rise to criminal prosecution. *Ibid.* The attempted inspection of appellant's home was merely to ascertain the existence of evils to be corrected upon due notification or, in default of such correction, to be made the basis of punishment.

We have said that "[t]he security of one's privacy against arbitrary intrusion by the police" is fundamental to a free society and as such protected by the Fourteenth

---

[1] If the nuisance constitutes an actual menace to health the Commissioner may abate it forthwith. Baltimore City Code, Art. 12, § 112.

Amendment. *Wolf* v. *Colorado*, 338 U. S. 25, 27. Application of the broad restraints of due process compels inquiry into the nature of the demand being made upon individual freedom in a particular context and the justification of social need on which the demand rests.

The history of the constitutional protection against official invasion of the citizen's home makes explicit the human concerns which it was meant to respect. In years prior to the Revolution leading voices in England and the Colonies protested against the ransacking by Crown officers of the homes of citizens in search of evidence of crime or of illegally imported goods. The vivid memory by the newly independent Americans of these abuses produced the Fourth Amendment as a safeguard against such arbitrary official action by officers of the new Union, as like provisions had already found their way into State Constitutions.

In 1765, in England, what is properly called the great case of *Entick* v. *Carrington*, 19 Howell's State Trials, col. 1029, announced the principle of English law which became part of the Bill of Rights and whose basic protection has become imbedded in the concept of due process of law. It was there decided that English law did not allow officers of the Crown to break into a citizen's home, under cover of a general executive warrant, to search for evidence of the utterance of libel. Among the reasons given for that decision were these:

> "It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty." *Id..* at col. 1073.

These were not novel pronouncements to the colonists. A few years earlier, in Boston, revenue officers had been authorized to use Writs of Assistance, empowering them to search suspected places, including private houses, for smuggled goods. In 1761 the validity of the use of the Writs was contested in the historic proceedings in Boston. James Otis attacked the Writ of Assistance because its use placed "the liberty of every man in the hands of every petty officer." [2] His powerful argument so impressed itself first on his audience and later on the people of all the Colonies that President Adams was in retrospect moved to say that "American Independence was then and there born." [3] Many years later this Court, in *Boyd* v. *United States,* 116 U. S. 616, carefully reviewed this history and pointed out, as did Lord Camden in *Entick* v. *Carrington,* that

> ". . . the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give

---

[2] Tudor, Life of James Otis (1823), 66. No complete text of the Otis speech is extant, but see notes of Horace Gray, Jr. in Quincy's Massachusetts Reports for 1761–1762, App. I, pp. 469 *et seq.* Tudor's life contains an account of it as well as of the events leading to the speech and the reaction to it.

[3] *Id.,* at 61. Adams said:

"Otis was a flame of fire; with a promptitude of classical allusions, a depth of research, a rapid summary of historical events and dates, a profusion of legal authorities, a prophetic glance of his eyes into futurity, and a rapid torrent of impetuous eloquence, he hurried away all before him. American Independence was then and there born. The seeds of patriots and heroes, to defend the *Non sine Diis animosus infans;* to defend the vigorous youth, were then and there sown. Every man of an immense crouded audience appeared to me to go away as I did, ready to take arms against Writs of Assistance. Then and there, was the first scene of the first act of opposition, to the arbitrary claims of Great Britain. Then and there, the child Independence was born. In fifteen years, i. e. in 1776, he grew up to manhood and declared himself free." *Id.,* at 60–61.

evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the Fifth Amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the Fourth Amendment." 116 U. S., at 633.

Against this background two protections emerge from the broad constitutional proscription of official invasion. The first of these is the right to be secure from intrusion into personal privacy, the right to shut the door on officials of the state unless their entry is under proper authority of law. The second, and intimately related protection, is self-protection: the right to resist unauthorized entry which has as its design the securing of information to fortify the coercive power of the state against the individual, information which may be used to effect a further deprivation of life or liberty or property. Thus, evidence of criminal action may not, save in very limited and closely confined situations, be seized without a judicially issued search warrant. It is this aspect of the constitutional protection to which the quoted passages from *Entick* v. *Carrington* and *Boyd* v. *United States* refer. Certainly it is not necessary to accept any particular theory of the interrelationship of the Fourth and Fifth Amendments [4] to realize what history makes plain, that it was on the issue of the right to be secure from searches for evidence to be used in criminal prosecutions or for forfeitures that the great battle for fundamental liberty was fought. While these concerns for individual rights were the historic impulses behind the Fourth Amendment and its analogues in state constitutions, the application

---

[4] The Court in *Boyd* v. *United States*, 116 U. S. 616, relied heavily on the interrelationship between the Fourth and Fifth Amendments, a view challenged by Professor Wigmore. See 8 Wigmore, Evidence. (3d ed. 1940), § 2264.

of the Fourth Amendment and the extent to which the essential right of privacy is protected by the Due Process Clause of the Fourteenth Amendment are of course not restricted within these historic bounds.

But giving the fullest scope to this constitutional right to privacy, its protection cannot be here invoked. The attempted inspection of appellant's home is merely to determine whether conditions exist which the Baltimore Health Code proscribes. If they do appellant is notified to remedy the infringing conditions. No evidence for criminal prosecution is sought to be seized. Appellant is simply directed to do what he could have been ordered to do without any inspection, and what he cannot properly resist, namely, act in a manner consistent with the main-tenance of minimum community standards of health and well-being, including his own. Appellant's resistance can only be based, not on admissible self-protection, but on a rarely voiced denial of any official justification for seeking to enter his home. The constitutional "liberty" that is asserted is the absolute right to refuse consent for an inspection designed and pursued solely for the protection of the community's health, even when the inspection is conducted with due regard for every convenience of time and place.

The power of inspection granted by the Baltimore City Code is strictly limited, more exacting than the analogous provisions of many other municipal codes. Valid grounds for suspicion of the existence of a nuisance must exist. Certainly the presence of a pile of filth in the back yard combined with the run-down condition of the house gave adequate grounds for such suspicion. The inspection must be made in the day time. Here was no midnight knock on the door, but an orderly visit in the middle of the afternoon with no suggestion that the hour was incon-venient. Moreover, the inspector has no power to force

entry and did not attempt it. A fine is imposed for resistance, but officials are not authorized to break past the unwilling occupant.

Thus, not only does the inspection touch at most upon the periphery of the important interests safeguarded by the Fourteenth Amendment's protection against official intrusion, but it is hedged about with safeguards designed to make the least possible demand on the individual occupant, and to cause only the slightest restriction on his claims of privacy. Such a demand must be assessed in the light of the needs which have produced it.

Inspection without a warrant, as an adjunct to a regulatory scheme for the general welfare of the community and not as a means of enforcing the criminal law, has antecedents deep in our history. For more than 200 years Maryland has empowered its officers to enter upon ships, carriages, shops, and homes in the service of the common welfare. In pre-revolutionary days trade, on which the viability of the struggling Colonies depended, was of primary concern. Thus, at a time when the tobacco trade was a vital part of Maryland's economy, inspections of ships and carriages without a warrant could be made to enforce uniform standards for packing and shipping tobacco.[5] Similarly, suspected evasion of import

[5] Nearly all the early Maryland statutes are contained in Records of the States of the United States of America, a collection compiled by the Library of Congress in association with the University of North Carolina in 1949. This collection is on microfilm. Many volumes of the early Maryland Session Laws are available in various library collections throughout the country. No complete collection is known to exist. A typical tobacco inspection statute is Maryland Laws, November 1773, c. 1, §§ LXXIV, LXXX. At times a warrant was required for inspections of homes. *Id.*, § LXXIII. See also Maryland Laws, 1717, c. VII. Other Colonies also had statutes allowing inspection to enforce standards for the manufacture or shipping of various items of trade. See, *e. g.*, Virginia Laws, 15 Geo. II (1742),

duties on liquor and other goods could be found out by inspection of stores and homes.[6] Generally the power of entry was carefully limited, requiring that ground for suspicion must exist and that the inspection be conducted between "the rising and the setting of the sun."[7]

In 1776 the newly independent State of Maryland incorporated, as part of its basic Declaration of Rights, the principle

> "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants—to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special—are illegal, and ought not to be granted." See 3 Thorpe, Federal and State Constitutions (1909), 1688.

This provision was a product of the same history of abuse and protest that gave birth to the Fourth Amendment.[8] It remains today as an essential part of Maryland's Constitution. Yet, the years following its proclamation saw not a decline but a marked increase in statutory authorization for inspection of the citizen's home. Not only were the old regulations continued, but the power of

c. IV (pork and beef); Virginia Laws, 12 Geo. III (1772), c. 11 (flour and bread); Pennsylvania Laws, 1722, c. CCLII (flour and bread); Pennsylvania Laws, 1727, c. CCXCV (beef and pork); Pennsylvania Laws, 1729–1730, c. CCCXVI (hemp).

[6] See, e. g., Maryland Laws, 1715, c. XLVI (tobacco); Maryland Laws, May 1756, p. 5, § XLVI; Maryland Laws, March 1758, p. 3, § X.

[7] Ibid.

[8] See Givner v. State, 210 Md. 484, 492–494, 124 A. 2d 764, 768–769. The Maryland Court of Appeals has said that this provision of its Declaration of Rights (originally Article 23, now Article 26) is "in pari materia" with the Fourth Amendment to the United States Constitution. Id., at 492.

inspection was extended to new community concerns. In 1782, Commissioners were empowered to "enter upon the lots, grounds, and possessions, of any person or persons . . .." in order to regulate and keep in repair the common sewerage systems.[9] Five years later similar entries on private property were allowed for the purpose of keeping the public roads in repair.[10] Typical of the regulatory statutes enacted in this period was an act permitting the clerk of the market "to examine and weigh all such bread, and to seize, for the use of the poor of the county, all such as they shall find deficient in weight or fineness, and not baked or marked as aforesaid . . .."[11] The penalty for resisting the entry of the clerk was "five pounds current money." And so, when, in 1801, the power of inspection without a warrant became an instrument of the enforcement of the Baltimore health laws, no novel or untried procedures were being invoked. The ordinance now challenged derives from this 1801 ordinance. It provided:

> "And be it enacted and ordained, That when, and as often as the said commissioners of health, or any of them, shall have cause to suspect a nuisance dangerous to the health of the city exists in any house, cellar or inclosure shut up from public view, they, or any one of them, may demand entry therein in the day time for the purpose of examining the same, and if the owner or occupier thereof shall refuse or delay

---

[9] Maryland Laws, Nov. 1782, c. XVII, § VII. A similar law had been in force in Pennsylvania since 1761. Pennsylvania Laws, 1761–1762, c. CCCCLXXX.

[10] Maryland Laws, April 1787, c. XXIII. See also Pennsylvania Laws, 1782, c. MXXXI.

[11] Maryland Laws, Nov. 1789, c. VIII, § 5. See also Maryland Laws, Nov. 1792, c. LXV, § VII; Maryland Laws, 1793, c. LVI; Maryland Laws, 1784, c. VII.

to open the same and to admit a free examination, he shall forfeit and pay for every such refusal the sum of twenty dollars, for the use of the corporation." [12]

From the passage of this ordinance to the present the prevention and abatement of "nuisances" on private property has been one of the chief concerns of the Baltimore City Health Department.[13] In the latter half of the nineteenth century, in the years following the ratification of the Fourteenth Amendment, thousands upon thousands of inspections were made under authority of this ordinance.[14] Thus the system of inspection here under attack, having its beginning in Maryland's colonial history, has been an integral part of the enforcement of Baltimore's health laws for more than a century and a half. The legal significance of such a long and consistent history of state practice has been illuminated for us by Mr. Justice Holmes:

"The Fourteenth Amendment, itself a historical product, did not destroy history for the States and substitute mechanical compartments of law all exactly alike. If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it, . . . ." *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31. (As to the constitutional significance of a "time-honored procedure" see *Murray's Lessee* v. *Hoboken Land and Improvement Co.*, 18 How. 272, and *Ownbey* v. *Morgan*, 256 U. S. 94.)

---

[12] Baltimore Ordinances, 1801–1802, No. 23, § 6. The Baltimore City Health Department may be the oldest in the country. See 35 Am. J. of Public Health (Jan. 1945), 49.

[13] See Howard, Public Health Administration and the Natural History of Disease in Baltimore, Maryland, 1797–1920 (1924), 140.

[14] See, *id.*, at 145–146. For example, in 1880 there were 4,292 nuisances inspected by sanitary inspectors. In 1890 there were 34,138 such inspections. *Ibid.*

Of course, this wise reminder, that what free people have found consistent with their enjoyment of freedom for centuries is hardly to be deemed to violate due process, does not freeze due process within the confines of historical facts or discredited attitudes.[15] "It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or the essentials of fundamental rights." *Wolf* v. *Colorado,* 338 U. S. 25, 27.

The power here challenged rests not only on a long history of its exercise. It is a power which was continually strengthened and applied to wider concerns through those very years when the right of individuals to be free from peremptory official invasion received increasing legislative and judicial protection. Nor is this a situation where a new body of knowledge displaces previous premises of action. There is a total want of important modification in the circumstances or the structure of society which calls for a disregard of so much history. On the contrary, the problems which gave rise to these ordinances have multiplied manifold, as have the difficulties of enforcement. The need to maintain basic, minimal standards of housing, to prevent the spread of disease and of that pervasive breakdown in the fiber of a people which is produced by slums and the absence of the barest essentials of civilized living, has mounted to a major concern of American government. The growth of cities, the crowding of populations, the increased awareness of the responsibility of the state for the living conditions of its citizens, all have combined to create problems of the

---

[15] Compare *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552, and *Ownbey* v. *Morgan,* 256 U. S. 94, with *Brown* v. *Board of Education,* 347 U. S. 483.

enforcement of minimum standards of far greater magnitude than the writers of these ancient inspection laws ever dreamed. Time and experience have forcefully taught that the power to inspect dwelling places, either as a matter of systematic area-by-area search or, as here, to treat a specific problem, is of indispensable importance to the maintenance of community health; a power that would be greatly hobbled by the blanket requirement of the safeguards necessary for a search of evidence of criminal acts. The need for preventive action is great, and city after city has seen this need and granted the power of inspection to its health officials; and these inspections are apparently welcomed by all but an insignificant few.[16] Certainly, the nature of our society has not vitiated the need for inspections first thought necessary 158 years ago, nor has experience revealed any abuse or inroad on freedom in meeting this need by means that history and dominant public opinion have sanctioned.

That there is "a total unlikeness" between "official acts and proceedings," *Boyd* v. *United States,* 116 U. S. 616, 624, for which the legal protection of privacy requires a

---

[16] The Baltimore Health Department keeps a record of the number of inspections made annually. All but a few of these are inspections of dwellings. The figures for the last five years are as follows: 1954, 28,081 inspections; 1955, 25,021 inspections; 1956, 35,120 inspections; 1957, 33,573 inspections; 1958, 36,119 inspections. Memorandum of Appellee at Request of Court 2. The Health Commissioner of Baltimore estimates that the number of prosecutions under § 120 average one per year.

Of 57 cities whose health codes were studied by the Urban Renewal Administration, 36 empowered their officers to enter and inspect for violations. See Provisions of Housing Codes in Various American Cities, Urban Renewal Bulletin No. 3 (published by Urban Renewal Administration of the Housing and Home Finance Agency 1956).

For a discussion of some of the problems of Urban Renewal, see Note, 72 Harv. L. Rev. 504.

search warrant under the Fourteenth Amendment, and the situation now under consideration is laid bare by the suggestion that the kind of an inspection by a health official with which we are concerned may be satisfied by what is, in effect, a synthetic search warrant, an authorization "for periodic inspections." I₁ a search warrant be constitutionally required, the requirement cannot be flexibly interpreted to dispense with the rigorous constitutional restrictions for its issue. A loose basis for granting a search warrant for the situation before us is to enter by way of the back door to a recognition of the fact that by reason of their intrinsic elements, their historic sanctions, and their safeguards, the Maryland proceedings requesting permission to make a search without intruding when permission is denied, do not offend the protection of the Fourteenth Amendment.

In light of the long history of this kind of inspection and of modern needs, we cannot say that the carefully circumscribed demand which Maryland here makes on appellant's freedom has deprived him of due process of law.

*Affirmed.*

Mr. Justice Whittaker, concurring.

The core of the Fourth Amendment prohibiting unreasonable searches applies to the States through the Due Process Clause of the Fourteenth Amendment. *Wolf* v. *Colorado,* 338 U. S. 25. I understand the Court's opinion to adhere fully to that principle. And being convinced that the health inspector's request for permission to enter petitioner's premises in midday for the sole purpose of attempting to locate the habitat of disease-carrying rodents known to be somewhere in the immediate area was not a request for permission to make, and that the Code procedures followed did not amount to enforce-

ment of, an unreasonable search within the meaning of the Fourth and Fourteenth Amendments, I join the opinion of the Court.

Mr. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, Mr. JUSTICE BLACK and Mr. JUSTICE BRENNAN concur, dissenting.

The decision today greatly dilutes the right of privacy which every homeowner had the right to believe was part of our American heritage. We witness indeed an inquest over a substantial part of the Fourth Amendment.

The question in this case is whether a search warrant is needed to enter a citizen's home to investigate sanitary conditions. The Court holds that no search warrant is needed, that a knock on the door is all that is required, that for failure of the citizen to open the door he can be punished. From these conclusions I am forced to dissent.

The Due Process Clause of the Fourteenth Amendment enjoins upon the States the guarantee of privacy embodied in the Fourth Amendment (*Wolf* v. *Colorado,* 338 U. S. 25)—whatever may be the means established under the Fourth Amendment to enforce that guarantee. The Court now casts a shadow over that guarantee as respects searches and seizures in civil cases. Any such conclusion would require considerable editing and revision of the Fourth Amendment. For by its terms it protects the citizen against unreasonable searches and seizures by government, whatever may be the complaint. The words are broad and inclusive:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Court said in *Wolf* v. *Colorado, supra,* at 27, that "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." Now that resounding phrase is watered down to embrace only certain invasions of one's privacy. If officials come to inspect sanitary conditions, they may come without a warrant and demand entry as of right. This is a strange deletion to make from the Fourth Amendment. In some States the health inspectors are none other than the police themselves. In some States the presence of unsanitary conditions gives rise to criminal prosecutions. Baltimore City Code, Art. 12, §§ 112 and 119—the one involved in the present case—makes the failure to abate a nuisance a misdemeanor. The knock on the door in any health inspection case may thus lay the groundwork for a criminal prosecution. The resistance of the citizen in the present case led to the imposition of a fine. If a fine may be imposed, why not a prison term?

It is said, however, that this fine is so small as to amount only to an assessment to cover the costs of the inspection. Yet if this fine can be imposed, the premises can be revisited without a warrant and repeated fines imposed. The truth is that the amount of the fine is not the measure of the right. The right is the guarantee against invasion of the home by officers without a warrant. No officer of government is authorized to penalize the citizen because he invokes his constitutional protection.

Moreover, the protection of the Fourth Amendment has heretofore been thought to protect privacy when civil litigation, as well as criminal prosecutions, was in the offing. Why otherwise the great care exercised by the Court in restricting agencies like the Federal Trade Commission in making investigations in support of their power to issue cease and desist orders? Fear of trespassing on Fourth Amendment rights was expressly made the

ground for a narrow reading of statutory powers in *Federal Trade Comm'n* v. *American Tobacco Co.*, 264 U. S. 298, 307. The "fishing expeditions" there condemned, *id.*, at 306, led no more directly to possible criminal prosecutions than the knock on the door in the present case.

The Court misreads history when it relates the Fourth Amendment primarily to searches for evidence to be used in criminal prosecutions. That certainly is not the teaching of *Entick* v. *Carrington*, 19 Howell's St. Tr. col. 1029. At that time—1765—it was the search for the nonconformist that led British officials to ransack private homes. The commands of our First Amendment (as well as the prohibitions of the Fourth and the Fifth) reflect the teachings of *Entick* v. *Carrington, supra.* These three amendments are indeed closely related, safeguarding not only privacy and protection against self-incrimination but "conscience and human dignity and freedom of expression as well." See *Ullmann* v. *United States,* 350 U. S. 422, 445 *et seq.* (dissent); *Feldman* v. *United States,* 322 U. S. 487, 499 (dissent). It is only in that setting that *Entick* v. *Carrington, supra,* can be understood, as evidenced by Lord Camden's long review of the oppressive practices directed at the press by the Star Chamber, the Long Parliament, and the Licensing Acts. 19 Howell's St. Tr. cols. 1069–1072. It was in the setting of freedom of expression that Lord Camden denounced the general warrants. Taylor, The American Constitution (1911), p. 234, gives the correct interpretation of that historical episode:

> "In the effort to destroy the freedom of the press, by a strained exercise of the prerogative a general warrant was issued in 1763 for the discovery and apprehension of the authors and printers (not named) of the obnoxious No. 45 of the *North Briton,* which commented in severe and offensive terms on the

King's Speech at the prorogation of Parliament and upon the unpopular Peace of Paris recently (February 10, 1763) concluded. Forty-nine persons, including Wilkes, were arrested under the general warrant; and when it was ascertained that Wilkes was the author, an information for libel was filed against him on which a verdict was obtained. In suits afterward brought against the Under-Secretary of State who had issued the general warrant, Wilkes, and Dryden Leach, one of the printers arrested on suspicion, obtained verdicts for damages. When the matter came before the King's Bench in 1765, Lord Mansfield and the other three judges pronounced the general warrant illegal, declaring that 'no degree of antiquity could give sanction to a usage bad in itself.' " And see 2 Paterson, Liberty of the Subject (1877), pp. 129–132.

This history, also recounted in *Boyd* v. *United States,* 116 U. S. 616, 625–626, was, in the words of Mr. Justice Bradley, "fresh in the memories of those who achieved our independence and established our form of government." The Fourth Amendment thus has a much wider frame of reference than mere criminal prosecutions.

The fallacy in maintaining that the Fourth Amendment was designed to protect criminals only was emphasized by Judge Prettyman in *District of Columbia* v. *Little,* 178 F. 2d 13, 16–17, aff'd on other grounds, 339 U. S. 1:

"The argument is wholly without merit, preposterous in fact. The basic premise of the prohibition against searches was not protection against self-incrimination; it was the common-law right of a man to privacy in his home, a right which is one of the indispensable ultimate essentials of our concept of civilization. It was firmly established in the com-

mon law as one of the bright features of the Anglo-Saxon contributions to human progress. It was not related·to crime or to suspicion of crime. It belonged to all men, not merely to criminals, real or suspected. So much is clear from any examination of history, whether slight or exhaustive. The argument made to us has not the slightest basis in history. It has no greater justification in reason. To say that a man suspected of crime has a right to protection against search of his home without a warrant, but that a man not suspected of crime has no such protection, is a fantastic absurdity."

Judge Prettyman added that the Fourth Amendment applied alike to health inspectors as· well as to police officers—indeed to every and any official of government seeking admission to any home in the country:

"We emphasize that no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate. This right of privacy is not conditioned upon the objective, the prerogative or the stature of the intruding officer. His uniform, badge, rank, and the bureau from which he operates are immaterial. It is immaterial whether he is motivated by the highest public purpose or by the lowest personal spite." *Id.*, at 17. And see 44 Ill. L. Rev. 845.

The well-known protest of the elder Pitt against invasion of the home by the police, had nothing to do with criminal proceedings.

"The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail—its roof

may shake—the wind may blow through it—the storm may enter, the rain may enter—but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!"

While this statement did not specifically refer to the general warrant, it was said in reference to the danger of excise officers entering private homes to levy the "Cyder Tax." 15 Hansard, Parliamentary History of England (1753–1765) p. 1307.

Some of the statutes which James Otis denounced did not involve criminal proceedings. They in the main regulated customs and allowed forfeitures of goods shipped into the Colonies in violation of English shipping regulations.[1] The twenty-dollar forfeiture involved here is no different in substance from the ones that Otis and the colonists found so objectionable. For their objection went not to the amount or size of the forfeiture but to the lawless manner in which it was collected. "Every man prompted by revenge, ill humour, or wantonness to inspect the inside of his neighbour's house, may get a writ of assistance." Tudor, Life of James Otis (1823), p. 68. It was not the search that was vicious. It was the *absence of a warrant issued on a showing of probable cause* that Otis denounced—the precise situation we have here:

> "Now one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle; and whilst he is quiet, he is as well guarded as a prince in his castle. This writ, if it should be declared legal, would totally annihilate this privilege. Custom-house officers may enter our houses when they please; we are commanded to permit their entry. Their menial servants may enter, may break locks, bars, and every thing in their way:

---

[1] 6 Geo. 2, c. 13 (1733); 13 & 14 Car. 2, c. 11 (1662); 15 Car. 2, c. 7 (1663); 7 & 8 Will. 3, c. 22 (1696).

and whether they break through malice or revenge, no man, no court, can inquire. Bare suspicion without oath is sufficient." *Id.*, at 66–67.

The philosophy of the Fourth Amendment was well expressed by Mr. Justice Butler speaking for the Court in *Agnello* v. *United States*, 269 U. S. 20, 32. "The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws." We have emphasized over and again that a search without a warrant can be made only in exceptional circumstances. If a house is on fire or if the police see a fugitive enter a building, entry without a search warrant can of course be made. Yet absent such extraordinary situations, the right of privacy must yield only when a judicial officer issues a warrant for a search on a showing of probable cause. *Johnson* v. *United States*, 333 U. S. 10, 14; *Trupiano* v. *United States*, 334 U. S. 699, 705; *McDonald* v. *United States*, 335 U. S. 451, 454–455. As we said in *McDonald* v. *United States*, *supra*, 455–456:

"The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse

the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."

In the present case, the homeowner agreed to let the inspector in, if he got a search warrant. But none was ever sought. No excuse exists here for not getting a search warrant. A whole day elapsed between the first inspection and the arrest. The only reason given for not getting a warrant was the officer's convenience:

"Q. Could you not just as well have made your inspection one hour or two hours later than at the time you demanded entry?

"A. I could not. I had two students I had to release at three o'clock. I have to be in the office at three-thirty every day to take care of my reports."

That is indeed flimsy ground for denying this homeowner the constitutional protection afforded by a search warrant.

We have as little reason for excluding this search from the Fourth Amendment as we would for limiting that Amendment to the kinds of warrants James Otis inveighed against—the writs of assistance and the general warrants. Cf. *On Lee* v. *United States,* 343 U. S. 747, 762; *Schwartz* v. *Texas,* 344 U. S. 199, 205. For as Chief Justice Vinson wrote in *Nueslein* v. *District of Columbia,* 73 App. D. C. 85, 87, 115 F. 2d 690, 692, while the Fourth Amendment "was written against the background of the general warrants in England and the writs of assistance in the American colonies," it "gives a protection wider than these abuses." See 2 Ala. L. Rev. 314; 3 Vand. L. Rev. 820; 63 Harv. L. Rev. 349. It was designed to protect the citizen against uncontrolled invasion of his privacy. It does not make the home a place of refuge from the law. It only requires the sanction of the judiciary rather than

the executive before that privacy may be invaded. History shows that all officers tend to be officious; and health inspectors, making out a case for criminal prosecution of the citizen, are no exception.

We live in an era "when politically controlled officials have grown powerful through an ever increasing series of minor infractions of civil liberties." 17 U. of Chi. L. Rev. 733, 740. One invasion of privacy by an official of government can be as oppressive as another. Health inspections are important. But they are hardly more important than the search for narcotic peddlers, rapists, kidnappers, murderers, and other criminal elements. As we have seen, searches were once in their heyday when the government was out to suppress the nonconformists. That is the true explanation of *Entick* v. *Carrington, supra.* Many today would think that the search for subversives was even more important than the search for unsanitary conditions. It would seem that the public interest in protecting privacy is equally as great in one case as in another. The fear that health inspections will suffer if constitutional safeguards are applied is strongly held by some. Like notions obtain by some law enforcement officials who take shortcuts in pursuit of criminals. The same pattern appears over and again whenever government seeks to use its compulsive force against the citizen. Legislative Committees (*Watkins* v. *United States,* 354 U. S. 178; *Sweezy* v. *New Hampshire,* 354 U. S. 234), one-man grand juries (*In re Oliver,* 333 U. S. 257), fire marshals (*In re Groban,* 352 U. S. 330, 337), police (*Rochin* v. *California,* 342 U. S. 165; *On Lee* v. *United States, supra,* 762; *Leyra* v. *Denno,* 347 U. S. 556), sometimes seek to place their requirements above the Constitution. The official's measure of his own need often does not square with the Bill of Rights.

Certainly this is a poor case for dispensing with the need for a search warrant. Evidence to obtain one was

abundant. The house was in a state of extreme decay; and in the rear of the house was a pile of "rodent feces mixed with straw and debris to approximately half a ton." This is not to suggest that a health official need show the same kind of proof to a magistrate to obtain a warrant as one must who would search for the fruits or instrumentalities of crime. Where considerations of health and safety are involved, the facts that would justify an inference of "probable cause" to make an inspection are clearly different from those that would justify such an inference where a criminal investigation has been undertaken. Experience may show the need for periodic inspections of certain facilities without a further showing of cause to believe that substandard conditions dangerous to the public are being maintained. The passage of a certain period without inspection might of itself be sufficient in a given situation to justify the issuance of a warrant. The test of "probable cause" required by the Fourth Amendment can take into account the nature of the search that is being sought. This is not to sanction synthetic search warrants but to recognize that the showing of probable cause in a health case may have quite different requirements than the one required in graver situations. It can hardly be denied, unless history is ignored, that the policeman's or the inspector's knock on the door is one of these "official acts and proceedings" which *Boyd* v. *United States, supra,* 624, brought squarely within the Fourth Amendment. That being true, it seems to us plain that there is nothing in the Fourth Amendment that relieves the health inspector altogether from making an appropriate showing to a magistrate if he would enter a private dwelling without the owner's consent.

That problem, while important overall, is not important to the situation with which we deal. Figures submitted by the Baltimore Health Department show that citizens

are mostly cooperative in granting entrance to inspectors.[2] There were 28,081 inspections in 1954; 25,021 in 1955; 35,120 in 1956; 33,573 in 1957; and 36,119 in 1958. *And in all these instances the number of prosecutions was estimated to average one a year.* Submission by the overwhelming majority of the populace indicates there is no peril to the health program. One rebel a year (cf. Whyte, The Organization Man) is not too great a price to pay for maintaining our guarantee of civil rights in full vigor.

England—a nation no less mindful of public health than we and keenly conscious of civil liberties—has long proceeded on the basis that where the citizen denies entrance to a health inspector, a search warrant is needed. Public Health Act of 1936, 26 Geo. 5 & 1 Edw. 8, c. 49, §§ 285–287; *Vines* v. *Governors,* 63 J. P. 244 (Q. B. 1899); *Robinson* v. *Corporation of Sutherland,* [1899] 1 Q. B. 751; *Wimbledon Urban District Counsel* v. *Hastings,* 87 L. T. Rep. (5 N. S.) 118 (K. B. 1902); *Consett Urban District Council* v. *Crawford,* [1903] 2 K. B. 183; 24 Halsbury's Laws (2d ed. 1937), p. 102, note m.

We cannot do less and still be true to the command of the Fourth Amendment which protects even the lowliest home in the land from intrusion on the mere say-so of an official.

---

[2] We are pointed to no body of judicial opinion which purports to authorize entries into private dwellings without warrants in search of unsanitary conditions. What is developed in the Court's opinion concerning Maryland's long-standing health measures may be only a history of acquiescence or a policy of enforcement which never tested the procedure in a definitive and authoritative way. Plainly we are not faced with a situation of constitutional adjudications of long duration, where change is resisted because community patterns have been built around them.