**UNITED STATES of America,**
**Plaintiff,**

v.

**Jose Gilberto LOPEZ–ANAYA,**
**Defendant.**

**No. Cr. 74–616–TUC—JAW.**

United States District Court,
D. Arizona.

Dec. 17, 1974.

Christopher L. Pickrell, Asst. U. S. Atty., for plaintiff.

Fredric F. Kay, Asst. Federal Public Defender, for defendant.

MEMORANDUM AND ORDER

RICHARD E. ROBINSON, Senior District Judge (Serving by Assignment).

This matter is before the Court on the defendant's Motion to Suppress seventeen (17) pounds of marihuana discovered during an inspection of the trunk of his vehicle by Border Patrol agents at

---

approximately milepost fourteen (14) on Interstate highway 19 which runs to the north from the port of entry at Nogales, Arizona.

On August 30, 1974, a "Warrant of Inspection" was issued by the United States Magistrate in Tucson, Arizona, pursuant to an affidavit presented by the Assistant Chief Border Patrol Agent for the Tucson section. The affidavit presented facts and statistics which (1) described the geographical characteristics of the border region in the area of the Nogales sub-station; (2) the population of the area; (3) the number of alien travelers on the principal north-south highways within the region; (4) the number of illegal immigrants apprehended by Customs officials and Border Patrol agents within the sub-station area; (5) the number of illegal immigrants apprehended in other parts of the country who admitted entering the country in the Nogales sub-station area and (6) the number of persons entering the United States at the Nogales port of entry. All of these facts led the Magistrate to conclude that mass violations of the United States immigration laws were occurring in the area of the Nogales sub-station. Accordingly, he issued a "Warrant of Inspection" or area search warrant which authorized the Border Patrol to establish a fixed checkpoint between milepost 7 and approximately milepost 35 on Interstate highway 19 for the purpose of stopping all motor vehicles traveling north "to determine the nationality and/or immigration status of the occupants of said vehicles (and) to conduct a routine inspection of said vehicles for . . . illegal aliens." The warrant was returnable in ten (10) days.

On September 6, 1974, the defendant was stopped by Border Patrol agents at approximately milepost 14 on Interstate highway 19 and his vehicle was subjected to inspection. When the trunk of his vehicle was opened Border Patrol agents detected the odor of marihuana. When a covering was removed from the spare tire well of the vehicle, seventeen (17) pounds of marihuana was discovered.[1]

The defendant now moves to suppress the marihuana on the grounds that his fourth amendment rights have been violated in that the "Warrent of Inspection" was issued without probable cause, the Border Patrol Agents were without probable cause for a search, and the manner of execution of the warrant was unlawful.

In an effort to stem the flow of illegal immigration into this country, the Border Patrol has apparently utilized temporary fixed checkpoints and roving patrols[2] in the border regions of the United States for the past several years pursuant to 8 U.S.C.A. § 1357(a)(3) (1970). In the past both procedures involved the brief detention and inspection of motor vehicles without a warrant or probable cause for the purpose of determining the immigration status of the vehicle's occupants. However, in 1973, the Border Patrol was required to stop these practices. Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). In *Almeida-Sanchez* the Supreme Court held that it was unlawful for Border Patrol agents on roving pa-

---

1. It is the defendant's contention in this case that probable cause for a search did not arise until the odor of marihuana was discovered by Border Patrol Agents. Since the marihuana would not have been detected if defendant had not been required to open his trunk pursuant to the "Warrant of Inspection", the legality of the seizure is dependent on the validity of the initial detention and inspection of the vehicle for the presence of illegal immigrants.

2. In a roving patrol, Border Patrol agents patrol the roads and highways in the general proximity of the international border stopping vehicles at random and subjecting the vehicle and its occupants to brief interrogation and inspection. Like the temporary checkpoints involved in this case, stops were made without a warrant and without probable cause for search or arrest.

trol to conduct warrantless searches upon automobiles found several miles within the United States unless the place where the vehicle was stopped was the "functional equivalent" of the international border, or the agents conducting the search had probable cause to believe that the vehicle contained illegal immigrants or contraband. In 1974, the Ninth Circuit Court of Appeals held that the same rule applied to temporary fixed checkpoints. United States v. Bowen, 500 F.2d 960 (9th Cir. 1974). Clearly, after *Almeida-Sanchez* and *Bowen*, the warrantless random inspection of vehicles at points away from the international border or its "functional equivalent" is unlawful and would require the suppression of evidence discovered during such inspections. However, *Almeida-Sanchez* was decided by a divided court (Powell, J., concurring; White, Blackmun, Burger and Renquist, JJ. dissenting), and the manner in which the Court divided on this question is highly instructive on the issue presently before this Court.

While the majority agreed that in the absence of proximate cause the fourth amendment could not tolerate the warrantless inspection of motor vehicles away from the international border, they could not agree on the effect that prior judicial approval for such inspections would have on their judgment. *Almeida-Sanchez, supra*, 413 U.S. at 270 n. 3, 93 S.Ct. 2535. In his concurring opinion, Justice Powell found that while he agreed with the majority that these were not the type of automobile searches which justified an exception to the warrant requirement of the fourth amendment, *See* e. g. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.

2d 419 (1970), he nevertheless felt that it was possible to establish probable cause or its "functional equivalent" to permit the continuation of these practices if the authorities first secured judicial approval by obtaining a warrant. The four dissenters agreed with Justice Powell on this latter point.[3] In other words, five members of the Court found that although the authorities could not demonstrate a reasonable belief that any particular vehicle contained illegal immigrants, they nevertheless felt that in light of the special circumstance present in this case, probable cause for the mass inspection of motor vehicles in the border regions of the country could be established. They based this view upon a line of cases beginning with Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967),[4] where it was held that public inspectors could obtain a warrant permitting them to search all of the buildings within a designated area for possible health code violations even though the government could not establish probable cause to believe that a health code violation existed in any one of the particular buildings within the designated area. *Camara* and its progeny are based upon the notion that searches that would be unlawful in the context of a criminal investigation may nevertheless be lawful in an administrative context if they are (1) strictly limited in scope to a valid administrative purpose, (2) such scope is not inherently highly intrusive of the rights of the person searched, (3) they are conducted for the purpose of enforcing an important public policy and (4) viable alternatives to the search are virtually non-existent. Despite the factual distinctions that exist between *Camara* and *Almeida-Sanchez* Justice Powell and the dissenters felt that the same

---

3. In the dissenting opinion of Justice White the dissenters found that a warrant was not required for the vehicle inspections in issue, so long as facts amounting to probable cause were otherwise present. However, the dissenters clearly agreed with Justice Powell that inspections conducted pursuant to a

warrant would be valid. *Almeida-Sanchez, supra*, 413 U.S. at 288, 93 S.Ct. 2535.

4. In *Camara* the Supreme Court overruled the case of Frank v. Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959).

kind of *special* circumstances which had led to their ruling in *Camara* were also present in this case. They identified the special circumstances which they found as: (1) the uncontroverted right of the United States to qualify immigration; (2) the uncontroverted power of the Customs Service to inspect vehicles without probable cause at the international border and to interrogate suspected aliens as to their immigration status at any time; (3) the almost insurmountable task of policing a long and virtually open international border; (4) the past experience of immigration officials in apprehending large numbers of persons who had illegally immigrated to this country; (5) the limited and nonintrusive nature of an inspection for the sole purpose of inquiring into the immigration status of a vehicle's occupants; (6) a long history of public acceptance of such practices in the border regions of this country; and (7) the existence of an important public policy in limiting immigration and the absence of a viable alternative to mass inspection for the enforcement of that policy.[5] The weight which the court gave to these special circumstances was also buttressed by the observation made by Justice Powell that in the great majority of cases, discovery of an illegal immigrant results in an administrative order of deportation rather than a criminal prosecution. *Almeida-Sanchez, supra,* 413 U.S. at 278, 93 S.Ct. 2535 (Powell, J. concurring).

With the case in this posture it is fairly clear that while a majority of the Court objects to the use of *warrantless* temporary checkpoints and roving patrols, a different majority has found that it is possible to establish probable cause or its "functional equivalent" to permit the continuation of these practices if the determination of probable cause is made by a neutral and detached magistrate who has been fully apprised of the objective facts necessary for him to determine whether the reasonably anticipated benefits of such practices will outweigh the intrusion and inconvenience to innocent travelers. Accordingly, the temporary fixed checkpoint established pursuant to warrant in this cause is valid if the warrant was founded on probable cause and was lawfully executed.

## PROBABLE CAUSE

Obviously, the probable cause requirement in the context of this case is intrinsically different from the probable cause required in most criminal investigations.[6] As Justice Powell noted, 413 U.S. at 283, 93 S.Ct. at 2545, the "standards for probable cause in the context of this case are relatively unstructured." However, he went on to identify four considerations which he felt were relevant to the issue:

"(i) The frequency with which aliens illegally in the country are known or reasonably believed to be transported

---

5. In *Camara* the Court relied heavily upon its conclusion that it would be impossible to enforce the cities health code unless general inspections were allowed. Finding a substantial public need for the enforcement of the health code, and general public acceptance of the practice, the Court found such inspections to be reasonable and lawful. In *Almeida-Sanchez,* Justice Powell and the dissenters, likewise found that it was virtually impossible to police a vast open border. Despite the best efforts of the Customs Service it was all too easy for aliens to cross the international border into the United States without detection. Accordingly, if federal immigration policy was to be enforced the justices felt it was necessary for Customs officials to have the power to

search out and apprehend aliens during their migration north.

6. One of the most striking differences between the "Warrant of Inspection" in this case and the ordinary search warrant is that this warrant specifies that all persons and vehicles coming within the area defined by the warrant are subject to brief detention and inspection. Ordinarily a warrant to search a particular location does not authorize the search of all persons found at that location.

The latter rule is, of course, based upon the fact that such persons are not described in the warrant. In the present case *all* northbound motorists within the designated area on Interstate highway 19 are described in the warrant.

within a particular area;[7] (ii) the proximity of the area in question to the border;[8] (iii) the extensiveness and geographic characteristics of the area, including the roads therein and the extent of their use,[9] and (iv) the probable degree of interference with the rights of innocent persons, taking into account the scope of the proposed search, its duration, and the concentration of illegal alien traffic in relation to the general traffic of the road or area.[10] "

All of those factors are satisfied in the afidavits filed with the Magistrate in this case.

The defendant does not challenge the government's statistics. But, he does contend that the four factors noted above are not enough to justify a warrant in these circumstances. He seems to contend that since each of the four factors are based merely upon the frequency with which a crime is committed or the proportion of criminals to non-criminals in a given area that this same rational could justify a general search warrant in any locality suspected of being a high crime area. This is an extremely serious allegation and one which must be satisfactorily answered. One of the primary motives for including the fourth amendment in the Bill of Rights was the founding fathers' distaste for the British use of general search warrants. For several reasons, however, this Court does not feel that the defendant's contention is well-founded.

In the first place, this Court is certain that the traditional concept of probable cause is not satisfied in this case and that probable cause only arises because of special circumstances. If the government did not possess extraordinary power at the international border; if the task of policing the border region was less complex; if there was no firm public policy on immigration, and; if present government practices were non-essential or were hated by the general public, then perhaps no probable cause could be found despite the frequency with which the law is violated, or the proportion of criminals to non-criminals in the area.

Secondly, factor (iv), above, is not based merely upon statistical frequencies or percentages, but is concerned with the degree of intrusiveness authorized by the warrant. In this case, the warrant strictly controls the manner in which it is to be executed. The warrant authorizes the inspection of motor vehicles for the limited purpose of determining the immigration status of its occupants. In most cases such inspections

---

7. The affidavit for inspection indicates that in fiscal year 1972, 12,624 aliens illegally entered the United States at the Nogales substation and were apprehended in various parts of the United States, including the Nogales sub-station area. In fiscal year 1973, there were 19,954 such persons apprehended. In fiscal year 1974, 14, 947 aliens illegally entered the United States in the Nogales sub-station area and were apprehended by officers in that area. The population of Santa Cruz county, as of 1970 was 13,966. The number of tourists visiting this area during this period, while surely substantial, is unknown.

8. The temporary fixed checkpoint in this case was established at milepost 14 along an Interstate highway which leads directly to the port of entry at Nogales, Arizona.

9. The Nogales sub-station area is described in the affidavit as mountainous and desert with a river valley running approximately through the center. The area encompasses approximately 2700 square miles. There are two principal north-south highways in this region, and both are covered by the Warrant of Inspection.

10. The warrant authorizes the Border Patrol to stop all vehicles on Interstate highway 19 between mileposts 7 and 35 for the purpose of conducting a routine inspection of said vehicles for the presence of illegal aliens. Since illegal alien traffic occurs at all hours the Border Patrol was empowered to establish such checkpoints at any hour of the day or night. The warrant was returnable in ten (10) days, however, beginning on July 15, 1974, and continuing at least until the defendant's apprehension, the Border Patrol had in its possession a Warrant of Inspection entitling its agents to establish temporary checkpoints on the two principal roads in the Nogales sub-station area.

would involve little more than a brief detention and cursory inspection of the vehicle's passenger compartment and trunk. It has been held that the government may briefly detain a motor vehicle for the limited purpose of identifying its occupants, United States v. Bonanno, 180 F.Supp. 71 (S.D.N.Y.1960), or determining the qualification of the driver to operate a motor vehicle. Lipton v. United States, 348 F.2d 591 (9th Cir. 1965). The determination of the immigration status of those in the vehicle's passenger compartment would be hardly more intrusive than this. Furthermore, it has been held that a limited intrusion upon the privacy of a citizen for a highly limited and generally administrative purpose may be justified under some circumstances even though probable cause for a search is lacking. United States v. Davis, 482 F.2d 893 (9th Cir. 1973). The cursory inspection of a vehicle's passenger compartment and trunk is probably less intrusive than the luggage search authorized in *Davis*, and the administrative nature of an inspection for the purpose of turning back aliens who would illegally enter this country is apparent even though criminal charges may occasionally be filed as a result. In summary, the geographic location of the area, the degree of intrusiveness authorized by the warrant, and the essentially administrative nature of the inspection adequately distinguish these inspections from community wide searches for evidence of crime.

## EXECUTION OF THE WARRANT

The defendant contends that even if the warrant would be otherwise lawful, the method by which it must necessarily be executed falls short of the standards imposed by the fourth amendment. As noted above, a temporary fixed checkpoint involves the use of a roadblock and subjects all persons coming into contact with the roadblock to detention and inspection. However, for various reasons not all motorists are subjected to the same degree of inspection. The defendant contends that since some motorists are subjected to greater scrutiny than others for illogical and inarticulable reasons that the manner of execution of the "Warrant for Inspection" is fatally defective.

It is axiomatic, of course, that a warrant should leave nothing to the discretion of the executing officer. Berger v. New York, 388 U.S. 41, 53, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). Such is the purpose for the fourth amendment requirement that all warrants shall particularly describe "the place to be searched, and the persons or things to be seized." However, so far as this Court can tell, that phase is usually taken to mean that the executing officer should not be left with any discretion as to who or what is covered by the warrant. *Id.* The fourth amendment is not ordinarily interpreted to mean that an officer must necessarily scrutinize all things coming within the terms of the warrant. The discretion to search a particular drawer or closet is inevitably and necessarily left to the executing officer and under ordinary circumstances the person whose belongings are subject to a search could not complain that the warrant was thoroughly or negligently executed so long as the executing officer stayed within the parameter described in the warrant. However, in this case, the defendant's contention is somewhat more serious since the discretion to subject some motorists to greater scrutiny than others leaves the Border Patrol open to charges of invidious indiscrimination. It is the defendant's contention that the law should not tolerate such discretion under a search warrant, or, in the alternative that even if this discretion is lawful, the law should not tolerate the exercise of such discretion in an invidiously discriminatory manner.

The "Warrant of Inspection" or area search warrant involved in this case is certainly susceptible to being executed in an invidiously discriminatory manner. However, absent evidence of discrimination this Court will not presume that the executive branch of the federal government will act in such a manner. Courts have, of course, in the past imposed operating standards upon federal law en-

 

forcement agencies for the prospective purpose of protecting the people from overzealous and unlawful official conduct. *See* Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). However, such standards recognize no more than the fact that law enforcement officers are zealous in the pursuit of criminals and understandably oriented toward the prosecution. Those standards are not based upon the presumption that federal law enforcement officers will act illogically for the purpose of invidiously discriminating against a particular class of citizens. Therefore, at least in the absence of substantial evidence that invidious discrimination has been practiced, this Court can find nothing wrong with the type of discretion left by this warrant to the executing officers.

The defendant seems to contend, that invidious discrimination has been practiced in this case. However, the only evidence offered by the defendant which would tend to support this contention is in the testimony of one of the Border Patrol agents who testified that one of the reasons he selected the defendant for more extensive inspection was because the defendant was, in his terms, a typical "crude head". This he defined as a person who had long hair and was dirty and illkept. This characterization of the defendant was, perhaps, both unwarranted and unfortunate. However, this was not the only reason offered by the Border Patrol for examining the defendant's vehicle more extensively. Government agents testified that in their experience the transportation of illegal aliens is usually done in a mid or large size late-model automobile with one male occupant and no other persons or items in the passenger compartment of the vehicle which might catch the attention of the authorities. When the defendant presented himself at the temporary checkpoint he fit this description. Of course, this general description of a suspect and his vehicle does not even approximate probable cause for a search. But, the officers in this case were not required to have probable cause, or even a reasonable suspicion about a particular vehicle. They were empowered to search every northbound vehicle in a designated area along the highway. The only limitations imposed upon them by law were that the search had to be limited to the purposes stated in the warrant, and the officers had to execute the warrant in such a way as not to invidiously discriminate against an identifiable class of citizens.

In this case, government agents reasonably believed that many of the vehicles stopped by their roadblock would contain illegal immigrants. They also knew from past experiences, the general characteristics of a vehicle used for smuggling aliens into the country. In light of the Warrant of Inspection and such knowledge as they had, the agents' decision to inspect the defendant's vehicle as thoroughly as was permissible under the warrant appears to be neither illogical, nor invidiously discriminatory.

Accordingly,

It is ordered that the defendant's Motion to Suppress is overruled.