Van Voorhis, J. (dissenting).
Appellant Paul Maddaus has been convicted of third degree assault, a misdemeanor, on complaint of a Sanitary Inspector. In 1958, we affirmed the reversal by the Appellate Division of his conviction of violating section 186 of the Sanitary Code of the City of New York on a charge of obstructing and interfering with the same Sanitary Inspector’s attempt to inspect an outhouse at his premises at 137 Giffords Lane, Staten Island. In dismissing that charge the Appellate Division said: “It appears that appellant was adjudged to be guilty in that he refused, upon constitutional grounds, to consent to an inspection without a warrant. By such conduct he did not ‘ interfere with or obstruct ’ an inspector, within the meaning of such section (District of Columbia v. Little, 339 U. S. 1).” (5 A D 2d 886.)
In affirming, we said: “the evidence presented at the trial fails to establish that the defendant committed the offense charged against him; by his conduct, he did not ‘ interfere with or obstruct ’ an inspector, within the meaning of section 186 of the Sanitary Code of New York City.” (4 N Y 2d 1003, 1005.)
Appellant is a middle-aged lawyer, nearly blind, who has owned the premises at the above address since 1948. He lives there alone without radio or television, uses an icebox instead of an electric refrigerator, volunteered that “this is a 17th Century house, your Honor”, and is apparently proud of an antique privy which, like the house, is evidently a landmark bringing to memory in tangible form the lives of our ancestors. It is not contended that this household accessory is insanitary, that it drains above ground or emits noxious odors or that it is in any way offensive except that, like the house, it is out of tune with the times. The Sanitary Inspector never was inside of it, consequently the record shows nothing of the contents of this small outbuilding. The Inspector does not even know, of his own knowledge, that it is a privy, so careful has lawyer Maddaus *627 been of Ms antiquarian treasures by keeping out all intruders. We are told that there is now a sanitary sewer in Cliffords Lane, and that section 143.03 of the Municipal Health Code requires Maddaus to connect to it if, indeed, this outhouse is currently being used as an outside toilet instead of being retained merely as a museum piece. I assume that if it is still being used as a privy, appellant could be compelled to connect it with the sewer.
In arguing his appeal pro se, appellant appeared to be a loner, cultured in manner, unostentatiously well versed in history and literature —■ as Ms brief indicates — and quite evidently his strongest wish toward this Sanitary Inspector is never to see him again. Something of the man’s nature is shown by the circumstance that the doorknob, with its attached square metal shaft, had been off from his entrance door for three years, during which interval he opened the door with the handle of a file. Here is an agreeable eccentric, angular and different from the crowd like most of the characters who have left their marks on the development of Anglo-American constitutional law, who is now feeling the effects of what Commissioner Robert Moses has recently described as 1 ‘ the increasingly crowded, hectic urban centers, where pressures for conformity are almost irre- . sistible. ’ ’ In fact he was chastised by one of the three-member criminal court for opening his door with a file instead of a handle, which may indicate that his principal crime consists in resolutely not being up to date.
Modern urban society has little use for such a man. Neither did the Criminal Court. This is the latest of a succession of trivial charges against appellant arising from his determination to preserve this ancient landmark on his property. The stenographic record leaves little doubt in my mind that, whatever the charge, he stood convicted before his trial began. I turn now to the contentions of the parties respecting this charge of third degree assault upon the Sanitary Inspector, who testified that this time he entered appellant’s premises, not to inspect the privy as before, but to serve a summons upon him charging violation of section 143.03 of the Health Code for not connecting it with the sewer. The Inspector had apparently been invested with the powers of a peace officer, as seems to have been contemplated by section 566 of the City Charter, and it is assumed that, regardless of the merits of the prosecution to be instituted, he was within his rights as a peace officer in entering the *628 premises to make service of legal process. He had a form book with him and made out the summons while he was standing on appellant’s porch. When told of the Inspector’s errand, appellant closed the door in his face, and it was after this, according to the testimony of both of them, that the summons was prepared and slid under appellant’s door. Here their two stories diverge. The Inspector testified that he walked away immediately after slipping the summons under the door, and that in “ six, eight, ten seconds ”, and while midway from appellant’s door to the sidewalk, he heard footsteps running after him, looked around, and “ got clipped on the jaw ” by Mr. Maddaus. He testified that appellant ‘ ‘ kept flailing at me” with both hands until reaching the sidewalk, whereupon appellant ‘ ‘ turned around and went inside.” The Inspector acknowledged that previously appellant had told him to leave the property.
Appellant’s version is that about five minutes after he heard the summons being slipped under the door he went into his kitchen, and noticed through a pane of glass that the Inspector was still standing on his property. After the lapse of another three or four minutes, due to appellant’s being unable to open the door on account of having lost the file which substituted for the doorknob in opening it — he said to the Inspector, “you’re, trespassing, get off.” To this the latter replied “I know my rights ” and remained standing where he was. Appellant, according to his testimony, thereupon 1 ‘ went up to him; I placed my hand on the collar of his topcoat, turned him around with as little force as possible to accomplish the result, and pushed bim along, that is to say, he walked ” about 55 feet toward the street and then “broke loose ” when he was still about 25 feet from the sidewalk. At that point appellant testified that the Inspector turned around, struck him four or five times in the face, knocked his glasses off and then ran off the premises. Appellant’s narrative concluded by saying “ I stayed just where he left me. My purpose had been accomplished. He was off the premises.” Appellant then returned to his house, after which the Inspector returned with a patrolman, who arrested appellant and took him to the police station.
I would agree, if appellant had a trial by due process of law, that all that confronts us would be a question of fact, if we assume, as I suppose we should under the presumption of official regularity, that the trial court decided that the Inspector was *629 not a trespasser — having come to serve a summons, and left as soon as practicable afterwards — or that, if he was a trespasser, appellant used more force upon him than was necessary in order to eject him from the premises. One of the three Judges (Judge Cawse) said at the conclusion of the trial: “ So that the record is clear, this member of the Court votes, first of all, that in my opinion I do not think Mr. Katz was a trespasser; and even if he was a trespasser, more force was used than necessary.”
The record does not inform us concerning whether the other two judges voted on a similar basis.
If the Fourth Amendment to the United States Constitution or section 12 of article I of the New York State Constitution were involved, the question would be close whether the Sanitary Inspector, at least in the absence of any external signs of nuisance or of any noxious condition, had the right to enter appellant’s outhouse against his objection. On the previous appeal under a charge of violation of section 186 of the New York City Sanitary Code, the judgment of conviction was reversed and the charge dismissed upon the grounds previously stated. The subsequent decision by the United States Supreme Court in Frank v. Maryland (359 U. S. 360) did not altogether resolve the question, as appears rather clearly from People v. Laverne (14 N Y 2d 304). In the Frank case no search warrant had been issued, to be sure, but a large quantity of rat excrement and other insanitary conditions were observable from the outside which would readily have formed a basis for the issuance of a warrant for a sanitary inspection. Here nothing of that kind existed, the record shows affirmatively that the Sanitary Inspector did not know positively that appellant’s outbuilding was actually being used as a toilet.
On this appeal the question is not presented whether the Inspector had a right to enter this outhouse against appellant’s objection. Neither are we confronted with whether the patrolman was guilty of false arrest in taking appellant into custody on the charge of a misdemeanor not committed in his presence, or whether anyone is chargeable with malicious prosecution. Appellant has shown no disposition to pursue either remedy provided that he achieves his utmost desire which is to be let alone.
*630 Regardless of whether appellant was guilty of violating section 143.03 of the Health Code, for which a summons was slipped under the door, the Inspector did not become a trespasser if he entered the premises to serve the summons and left promptly thereafter. Upon the contrary, if, as appellant testified, he stood for five minutes on the lawn or in the garden, and refused to leave when appellant directed him to do so, he would appear to have become a trespasser thus entitling appellant to use such force as might be necessary in order to eject him. In the absence of more explicit findings, we would ordinarily be bound to assume that the Criminal Court found him guilty according to law by deciding the facts as above indicated. That would be true if appellant had been tried by due process of law. It seems to me that he had nothing which could accurately be termed a trial. The frequent, loaded, angry and often irrelevant and abusive interjections of all the members of the court remind one of the dicasts in Aristophanes’ “ The Wasps ” who were so fond of judging that they delighted in stinging the litigants.
To begin with it was unfair to endeavor to preclude defense counsel from showing that the Sanitary Inspector did not know what was inside this outbuilding. He was asked on cross-examination:
“ Q. Did you inquire or observe inside this outer building that a privy, in fact, was located there ? A. No.”
This was stricken by the Presiding Judge, who attempted to counteract it by himself asking the Inspector:
“ The Presiding Judge: What is an outhouse used for?
‘ ‘ The Witness: Defecating, your Honor.
“ The Presiding Judge: All right.
“ The Witness: And urinating.”
A little later another Judge, named Fubsy, interjected: “It doesn’t make any difference what it contained. If it was a privy, he says he made an inspection. How elegantly it was furnished, or how it wasn’t furnished isn’t material.” Repeatedly the Inspector testified that his “ inspection” consisted of looking at it from the outside, that he did not know what was within.
When the Inspector was interrogated on cross-examination concerning what was the most recent date prior to the day in question (September 27,1960) when he inspected the premises — *631 from the outside — he said that he did not have his papers with him. Then the following ensued:
1 ‘ The Presiding Judge: Say you can’t answer the question.
“ The Witness: I can’t answer that question.”
The record demonstrates, to my mind at least, that from the outset of the trial each Judge had determined to convict him. For example, Maddaus testified that it was eight or ten minutes after the summons had been slipped under his door before he chased the Inspector from the premises. Endeavoring to prove that the Inspector’s testimony was false that all of this occurred in “ six, eight, ten seconds ”, the evidence for the defendant was introduced about the knob being off the door and the necessity for opening it with a file. This part of the door was actually introduced in evidence (exhibit A) in substantiation of the veracity of Maddaus’ testimony about its condition, and Maddaus swore that five minutes elapsed after the summons had been slipped beneath his door before he saxv the Inspector standing on the lawn near a bush and then he tried to open the door to cause him to leave. He could not find the file, which required three or four minutes before he was able to open the door. This was clearly stated in the early part of Maddaus ’ testimony, who testified that in all it was eight or ten minutes after the summons had been put under the door before he chased the Inspector away. The point in this was, of course, to indicate that the Inspector did not leave as he should have done promptly after serving the summons, and, by lingering on the premises, had become a trespasser regardless of whether he originally had the right to enter in order to serve this process. Misstating what Maddaus had testified, all three of the Judges devoted six or seven pages of the testimony to taunting appellant over living in a house where he was required to take eight to ten minutes to open his door whenever he went in or out. When appellant’s attorney correctly pointed out that this was not what his client had said upon the witness stand, it apparently angered the Bench. Bearing in mind that all three Judges were mistaken in their recollection of his testimony, I quote part of the colloquy:
“ The Presiding Judge: And it took him eight to ten minutes to get out.
“ Mr. Blumenthal: That’s not what his testimony will be, but that—
*632 “ Judge Furey: That’s what he said.
“ The Presiding Judge: That was his testimony.
“ Judge Cawse : That was his testimony.
“ Judge Furey: That’s what he said.
“ Mr. Blumenthal: If the Court will let me finish.
“ The Presiding Judge: I don’t see what purpose —
“ Judge Furey: He’s had this lock on for three or four or five years. All he needed was a handle to open it and he uses a nail file, or a file.
‘ ‘ Mr. Blumenthal: If the Court please, your Honor, it is not what the defendant testified occurred with respect to Mr. Katz that we are challenging. We are challenging what Mr. Katz testified to, namely, that he left the property expeditiously in a certain period of time, but that before he did so this defendant assaulted him from behind. We wish to establish by this test that there was insufficient [sic] time for this to have occurred.
“ Judge Furey: You want us to believe that a man will keep a lock in the door that takes eight to ten minutes to open that he has to use every day?
‘ ‘ The Witness: That is not the testimony, your Honor.
" Mr. Blumenthal: If your Honor please, that will not be the testimony. The Court is anticipating, your Honor. I ask you to permit me —
“ Judge Furey: That’s what he said so far, and that’s all the evidence we have.
“ Judge Cawse: You made the issue. The defendant stated it took him eight to ten minutes to get the door open.
“ Judge Furey : He had to go to a tool case, had to get the file out. The file wasn’t hanging on the door where it should be.
“ Mr. Blumenthal: If. the Court pleases, we’re not attempting to impeach what the main witness —
“ Judge Cawse : You made the issue, though.
“Mr. Blumenthal: Not on the complaining witness’ terms, your Honor. * * *
“The Presiding Judge: And he said it was eight to ten minutes.
‘ ‘ Mr. Blumenthal: Exception noted, your Honor.
“ The Presiding Judge: You may have an exception. Proceed.
“ Judge Cawse : So that I’m clear, Mr. Maddaus, how long did it take you to get the door open on September 27th, 1960 after you saw Katz outside there before you ran out? Let’s take it *633 from the time that you heard that noise under the door until you say you went out to the sidewalk?
“ The Witness: Well, I heard the noise. Then it was five minutes before I saw Mr, Katz standing outside. Then it was three or four minutes from that time until I got the door open.
“ Judge Cawse: So my eight to ten minutes was fairly close; you make it nine now?
“ The Witness: He had been on the premises after service of the summons for the —
“ Judge Cawse: That’s what I mean.
“ The Witness: Yes.
“ Mr. Blumenthal: If the Court please, this goes to the weight of the testimony Mr. Maddaus is giving. Mr. Maddaus is not testifying that it took him eight to so many minutes to open this lock.
“ Judge Cawse : He said on that day it took him three or four minutes.
“ The Witness: After I found the latch, your Honor —
“ Mr. Di Vernieri: This sounds like summation, Judge.
‘ ‘ Judge Cawse : It took you five minutes before you moved, and then it took you three to four minutes to do something with the lock in order to get it open?
‘ ‘ The Witness: To find the file.
‘ ‘ Judge Cawse : All right.
“ The Witness: When I had the file it took me only fifteen seconds to open the door.
“Judge Cawse: Now, we’re getting up to my ten minutes, Counsel.”
There is a virulence in this, and a refusal to understand or comprehend what the defendant was trying to say, which is hardly consistent with even-handed justice.
That the case had been prejudged is rather emphatically shown at the point where appellant testified that he removed Mr. Katz, the Sanitary Inspector, from his premises “ with as little force as possible to accomplish the result ”. Perhaps that testimony might have been excluded as conclusory, but nobody mentioned that. Instead, the following ensued:
“ Judge Fxjrey: You mean with as much force as possible?
“ The Witness: With as little force as possible.
“Judge Furey: Well, how could you determine as little as possible?
*634 ‘ ‘ Mr. Blumenthal: If the Court please, your Honor, the witness testified ‘ with as little force as possible to accomplish the result ’.
“ The Witness: That’s correct, your Honor.
“ Judge Ftjrey: Well, the right terminology is with as much force.
“ Judge Cawse : With as much force as possible to accomplish the result.
“ Mr. Blumenthal: No, sir, there’s a substantial difference.
‘ ‘ The Witness: With just so much force —
“Mr. Blumenthal: Mr. Maddaus —
“ Judge Cawse : All right, I give up.
“Judge Furey: What you’re saying is he could have used more force but —
“ Judge Cawse: This is the greatest bunch of semantics I’ve ever heard in my life, Counsel, with you and your witness, but it’s all right with me if you want to engage in it.
‘ ‘ Mr. Blumenthal: I have no desire to engage in semantics or to waste the Court’s time.
“ Judge Cawse: You’re not wasting my time; I’m here until five o’clock, and I always sit here every day until five o’clock ready to serve the public.
" Mr. Blumenthal: Thank you, your Honor.
“ Judge Cawse: Go ahead.”
Whatever else this colloquy showed, it was the Judges of the court who introduced what they called semantics by directly contradicting defendant’s testimony, when Judge Furey interrupted by correcting him saying: “ You mean with as much force as possible?” The witness repeated what he had just said, viz., “With as little force as possible ”, whereupon Judge Furey told bim that (‘ the right terminology is with as much force.”
This was a good deal more than semantics. It was telling the witness to testify to the exact opposite of what he had said.
It is difficult to convey the atmosphere of this trial by occasional excerpts, but if one reads the short record (the testimony, motions, colloquy and all occupy only 78 pages) it is difficult to avoid the conclusion that this man never had a chance, that the minds of the judges were closed and hostile toward him from the start. This was more than acting under pressure of time. The intervention of these Judges caused the case to take much more time than would have otherwise been required.
*635 “It is obvious, from such statements, that the trial justice was biased and prejudiced against said defendants at the commencement of the second trial. Under the circumstances, we think they were entitled to have the case tried before another justice and that their motion to that effect should have been granted.” (Sherk v. Catena, 235 App. Div. 686). The statement of the Trial Justice to which the Appellate Division there referred was that “ The retrial of this case only confirms the conviction that I had on the first trial that neither of the defendants is worthy of belief. They would both swear to anything. ’ ’ The Appellate Division held that, since the Trial Justice entertained this ineradicable previously formed opinion, the Justice should have disqualified himself. “ It is axiomatic that a proper administration of law demands not only that courts and judicial officers refrain from actual bias but that they avoid all appearance of unfairness known as implied bias.” (People v. McDermott, 180 Misc. 247, 248.)
Daniel Webster in his brief in Trustees of Dartmouth Coll. v. Woodward (4 Wheat. [17 U. S.] 518, 581) described due process of law in this way: “ By the law of the land is most clearly intended the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society.”
The writer knows all too well the tensions, exasperations, time pressures and the insolubility of many of the awkward human problems that daily overcrowd a busy court. The Judges are not on trial, but the defendant is, and, difficult as he may be, I think that he has been accorded something less than due process of law. The judgment of conviction should be reversed.
Judgment affirmed.