ROBERT C. LEGAT, JR. v. JOSEPH A. ADORNO,
TREASURER OF THE STATE OF CONNECTICUT

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, JS.

Argued June 14—decided July 24, 1951

*Leo V. Gaffney,* for the plaintiff.

*William L. Beers,* deputy attorney general, with whom, on the brief, was *George C. Conway,* attorney general, for the defendant.

*John Q. Tilson, Jr.,* with whom was *Angus N. Gordon, Jr.,* as amicus curiae.

*Ernest McCormick,* with whom, on the brief, was *Lee C. Fielden,* as amicus curiae.

*George J. Coyle,* as amicus curiae.

Brown, C. J.   The principal question for determination in this taxpayer's suit for a declaratory judgment

and an injunction is whether § 3 of the Institutional Building Bonds Act, authorizing capital expenditures of state funds for institutions only partially maintained by the state or under the supervision of an agency thereof, violates § 1 of article first of the state constitution, which prohibits the grant to anyone of "exclusive public emoluments or privileges." The questions reserved for the advice of this court upon the facts stipulated are stated in the footnote. [1]

The General Assembly at the special session of June, 1949, authorized and provided, by Special Act No. 9, known as the Institutional Building Bonds Act, for a $17,000,000 bond issue. 25 Spec. Laws 1408. Section 3 of the act, hereinafter referred to as the bond act, specified that the proceeds of the sale of the bonds were to be paid into an "Institutional Building Fund." Of this fund, $15,000,000 was designated to "be used to purchase land, construct or acquire buildings, purchase equipment or make capital expenditures of any kind at humane, reformatory or penal institutions wholly maintained by the state of Connecticut," and $2,000,000 to be used to eliminate fire hazards in such institutions.

---

[1] 1. Whether the construction of institutional buildings and the making of capital improvements upon humane, reformatory or penal institutions or hospitals, as stated in the complaint, and upon the property of the New Britain Memorial Hospital in particular, constitute a violation of article first, § 1 of the constitution of this state, or are otherwise an unconstitutional expenditure of public funds for private purposes.

2. Does the issuance of further bonds under the Institutional Building Bonds Act require the approval of a committee composed of the governor, the comptroller and the commissioner of finance and control?

3. If the approval of said committee is not required, does the issuance of such bonds require the approval of any other state official or committee?

4. Does the repeal of § 2859 of the General Statutes render impossible the issuance of further bonds under the Institutional Building Bonds Act?

During the November, 1949, special session, by Special
Act No. 9, approved December 23, 1949, § 3 was re-
pealed and then re-enacted, except that the words
"wholly or partially maintained by the state of Con-
necticut or under the supervision of an agency thereof"
were substituted for the words "wholly maintained by
the state of Connecticut," the words "or hospitals" were
inserted after "penal institutions," and the words "under
the direction of said committee" after the words "be
used." The committee referred to was that existent
under § 2859 of the General Statutes and consisted of
the governor, the comptroller and the commissioner of
finance and control. The effect of the first, and most
important, of these changes was to authorize expendi-
tures from the fund not only for state institutions but
also for institutions "partially maintained by the state"
or "under the supervision of an agency thereof."

The New Britain Memorial Hospital is located in
New Britain. Its original charter was granted by the
General Assembly in 1941. 23 Spec. Laws 1112. The
charter provides for the maintenance of a municipal
hospital for the treatment "of all persons suffering from
chronic or other diseases who shall apply therefor,"
authorizes it, as necessary for its purposes, to acquire
and hold property "free from taxation" and to dispose
of it, authorizes the city of New Britain to transfer to
the hospital the property and assets necessary for its
proper organization, operation and maintenance, pro-
vides for the appointment by the mayor of twenty-five
corporators and for the annual election by them of a
board of from seven to twelve directors, and gives the
board of directors "power to manage and conduct all
the business and affairs of the corporation . . . and to
do all acts necessary and proper to be done for the full
and effectual carrying out of the purposes of [the]
corporation." The hospital's present name was adopted

in 1943 by an amendment of the charter. 24 Spec. Laws 271.

On March 23, 1950, the committee constituted under § 2859 of the General Statutes allotted $3,000,000 to the commission on the care and treatment of the chronically ill, aged and infirm, a state agency under §§ 4193 and 4194 of the General Statutes, for the expansion of facilities of the New Britain Memorial Hospital. On April 4, 1950, the state, acting through this commission, duly authorized, entered into a written agreement with the hospital. This refers to the hospital's desire to expand its facilities for chronically ill, aged and infirm patients, its lack of funds to do so, and the commission's desire to provide additional buildings on the hospital's property for the care of patients for whom the commission is responsible. The agreement then provides that the state, at its expense, shall expand the facilities of the hospital upon the latter's land as the parties shall agree and approve and as directed by the committee referred to above; that the hospital shall accept title to the added facilities and shall thereafter be paid by the state for care of the state's patients, who are to have priority; that provision shall be made for the appointment by the governor of six additional hospital directors, to include two members of the commission; that the qualifications and appointment of the medical staff and the standards of care shall be subject to the commission's supervision and approval; that it may advise and counsel as to the management and operation of the facilities; and that the contract may be terminated, in which event reasonable compensation shall be paid by the party taking over the property.

Effective May 18, 1950, the charter of the hospital was amended to provide for appointment of six additional directors as called for by the agreement. Spec. Act No. 1, Spec. Sess., March, 1950. These directors

were duly appointed and are serving. Subsequent to April, 1950, and pursuant to the agreement, the state through its duly authorized agent entered into two contracts with general contractors for the construction of additional facilities and the grading of the site at the hospital, and has paid them in excess of $200,000. Because of a question as to the constitutionality of the expenditure of state funds on privately owned property, further payments to the contractors were withheld and this action was brought.

These further facts are stipulated, relating not only to the New Britain Memorial Hospital but to all the institutions upon the property of which it is planned and intended that institutional buildings will be erected and capital improvements will be made by the state: The corporations are without capital stock, are not organized for profit and are tax exempt; their property is solely and permanently devoted to humane, reformatory or penal purposes; they are managed by members of boards, none of whom receives any financial gain or any remuneration beyond reasonable compensation for expenses and services actually performed; the expenditures made and planned to be made will serve a public purpose in enabling the state to provide care and treatment for the aged and chronically ill and for other persons who would properly be treated and cared for in a state institution.

Before we can determine whether § 3 of the bond act and what was done pursuant to it with relation to the New Britain Memorial Hospital involved a violation of § 1 of article first of the Connecticut constitution, we must consider certain relevant statutory provisions. As appears from what we have already stated, a bond issue of $17,000,000 was duly authorized, the committee under § 2859 was empowered to allot the amounts to be expended, and the commission on the care and treat-

ment of the chronically ill, aged and infirm was accorded certain powers and duties. While it is stipulated that the state, "acting through [this] commission . . . duly authorized," entered into the contract with the New Britain Memorial Hospital, § 4194 of the General Statutes contains a provision that the "commission . . . shall plan and, subject to the approval of the general assembly, construct or purchase, lease or otherwise acquire . . . and staff and operate, such buildings as it deems necessary for the care of" chronically ill, aged and infirm persons. This requirement of approval by the General Assembly would effectively nullify the stipulation quoted, since such approval was never obtained for the contract with the hospital, were it not for the provision in § 3 of the bond act that not more than $15,000,000 of the proceeds of the sale of the bonds "shall be used under the direction of" the committee under § 2859 for acquiring buildings or making capital expenditures as specified. Section 4194, originally § 612h of the 1945 Supplement, became law June 23, 1945. Since § 3 of the bond act was approved December 23, 1949, it was effective to supplant the earlier requirement of § 4194 for approval by the General Assembly, and the action by the committee created by § 2859 therefore sufficed.

The provisions of the hospital's charter leave no doubt that it is a "hospital" within the terms of § 3 of the bond act and that its board of directors had authority to execute the contract with the state to provide additional facilities. Furthermore, the terms of the contract were sufficient to bring the hospital within the act's provision "partially maintained by the state of Connecticut." It was not essential that such maintenance should have existed prior to the execution of the contract, since it made provision therefor for the future. There is the more reason for so holding in this case be-

cause the wording of the contract shows that it likewise guarantees that the hospital will be "under the supervision of an agency" of the state, thus fulfilling also the alternative provision of the statute. The amendment of the hospital's charter and the appointment thereunder by the governor of the six additional directors to its board, in compliance with the contract, afford the added assurance that such supervision is to be effective. Therefore, the contract was valid unless § 3 of the bond act is violative of § 1 of article first of the constitution. This section states "That all men when they form a social compact, are equal in rights; and that no man, or set of men are entitled to exclusive public emoluments or privileges from the community." Whether a legislative grant of state funds for the construction of buildings or for other capital expenditures upon the land of another which is a charitable institution such as the hospital in this case constitutes a violation of this section has never been determined by this court. There appears to be a paucity of authority in other jurisdictions passing upon the question presented by this precise situation.

It is a fundamental principle of American democracy that public funds shall not be granted to any individual or individuals where they would clearly serve only private gain or advantage. *Lyman* v. *Adorno,* 133 Conn. 511, 515, 52 A. 2d 702. To avoid the violation of this principle, a legislative appropriation must be for a public purpose. If the expenditure of public funds for which the act provides will directly promote the welfare of the community in equal measure, it is for a public purpose. *Beach* v. *Bradstreet,* 85 Conn. 344, 350, 82 A. 1030. In deciding whether, under the terms of a statute, the expenditure is for a public use or purpose, "courts must be governed mainly by the course and usage of the government, the objects for which

taxes have been customarily and by long course of legislation levied, and what objects or purposes have been considered necessary to the support and for the proper use of the government, whether State or municipal." *Baker* v. *West Hartford,* 89 Conn. 394, 399, 94 A. 283; *Forman Schools, Inc.* v. *Litchfield,* 134 Conn. 1, 9, 54 A. 2d 710. The objects for which taxes customarily and by long course of legislation have been levied are disclosed by the purposes for which the public money has been expended. It is immaterial whether the expenditure has resulted from the appropriation of tax receipts or the proceeds of bonds issued or from the granting of exemption from taxes. See *Corbin* v. *Baldwin,* 92 Conn. 99, 104, 101 A. 834.

The General Assembly since colonial days has consistently and continuously made appropriations to various charitable institutions for the carrying on of their functions. Charitable hospitals have been included in such appropriations for charity patients at least since 1854. See 3 Spec. Laws 309. For several decades past, a regularly recurring appropriation has been made to the general hospitals of the state. See the Special Laws and §§ 291-294 of the General Statutes. The history of public grants to other kinds of charitable institutions extends much further back. Thus, as early as 1745 the General Assembly in revising the charter of Yale College granted a specified tax exemption and an appropriation of £100 per year to the college. 1 Spec. Laws 477. In short, it has been the ancient, settled and continuous practice in Connecticut to make grants to charitable institutions which serve a public purpose. See also 17 Spec. Laws 408; 25 Spec. Laws 1374; 10 Spec. Laws 70. This practice, followed before the adoption of the present constitution in 1818, has been continued since. In one instance an appropriation was made for a capital expenditure to provide for payment of a $17,635 mort-

gage upon property of a private charitable institution for the care of imbeciles, by an act specifying that the payment made by the state should create a lien in its favor upon the mortgaged property. 8 Spec. Laws 120; see *Yale College's Appeal,* 67 Conn. 237, 245, 34 A. 1036. Over two hundred years of uninterrupted and unchallenged history in the making of appropriations of the kind referred to is entitled to great weight. *Baker* v. *West Hartford,* 89 Conn. 394, 399, 94 A. 283.

The same purpose of the state has been manifest in the exercise of its traditional power of granting tax exemption to charitable hospitals. This, like the grant of appropriations mentioned above, has never been questioned. The obvious reason is that care of the sick is essential to the public welfare. See *Keefe* v. *Union,* 76 Conn. 160, 166, 56 A. 571. The need cannot be fully met by reliance solely on private hospitals operating from profit motivation. Provision for it must be made by charitable hospitals or the state. The grant of tax exemption to these hospitals, like that of appropriations, encourages and facilitates their performance of a governmental duty which would otherwise have to be performed by the state. Similarly, certain nonprofit schools serve a public purpose and help fulfill a governmental duty, and so likewise have been exempted from taxation even though governmental facilities in this field are much more adequate and complete than those for the care of the sick. *Forman Schools, Inc.* v. *Litchfield,* 134 Conn. 1, 9, 54 A. 2d 710; *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A. 2d 702; *Yale University* v. *New Haven,* 71 Conn. 316, 330, 42 A. 87.

While, as already stated, this court has never passed directly upon the issue now before us, it has, as appears from the cases cited above, rendered decisions which, at least as to grants by the state to charitable institutions of tax exemption and for maintenance, are incon-

sistent with the claims asserted by the plaintiff. In these cases the recipients who benefited by the state's enactments were engaged in rendering a public service, and in sustaining the grants made we have given heed not only to the historical practice of this state but also to the presumption that since the question of policy involved is for the General Assembly's decision an act of or appropriation by it is valid unless the contrary clearly appears. Where a provision of law will serve to further the welfare of the citizens of the state we must "make every intendment in favor of the validity of the act, and we can hold it unconstitutional only if there is no reasonable ground upon which it can be sustained." *Lyman* v. *Adorno,* supra, 514. We have further pointed out in sustaining such provisions that "their object was not to exempt private property used for private purposes, but property, public or private, which has been sequestrated or devoted to the service of the public." *Stamford Jewish Center, Inc.* v. *Stamford,* 117 Conn. 379, 383, 168 A. 5. It is also apparent from the foregoing authorities that the limitation on the expenditure of public funds enunciated in a few cases in other jurisdictions—that the money must be expended directly by the officers or agencies of the government— has never been recognized in this state. Under the Connecticut constitution an appropriation may be proper provided it is for a public purpose, even though the disbursement of it is not restricted to officers or agencies of the state itself.

The same principles which we have discussed as determinative of the validity of tax exemptions and of grants for maintenance are applicable in the decision of this case. The difference between such grants to charitable institutions of the nature concerned in this case and a grant which is a capital expenditure under § 3 of the bond act is one of degree only and involves

no difference in principle. In so far as the situation relative to the New Britain Memorial Hospital is concerned, there are strong practical considerations for holding, if warranted under the law, that no violation of the constitutional prohibition is involved either in the provisions of § 3 or in what has been done relative to the hospital thereunder. That the state needs the hospital facilities which are the subject of the contract is not open to question. Possible ways of attempting to meet this need are by paying for service at existing hospitals, should it be available, by leasing and maintaining buildings to serve as state institutions, and by constructing and establishing state institutions. Instead, by the method under scrutiny, existing conditions apparently have been taken into account to accomplish the desired result in the most advantageous way. The new facilities needed by the New Britain Memorial Hospital to do the job are provided, and the state is enabled to avail itself of the staff, organization and facilities of the hospital's existing organization by simply providing for additions to its physical plant. The economy and efficiency of such a plan are apparent. Not only are the properly staffed facilities requisite for the state's needs provided under the contract but the state is given the power of supervising them. Furthermore, the contract guarantees reasonable reimbursement of the state for any capital outlay made in the event of its termination, and, most important of all, the Statute of Charitable Uses, § 7082, assures that the building constructed "shall forever remain to the uses" specified and "to no other use whatever."

The briefs submitted in this case have brought to our attention a very large number of decisions from other states bearing upon various aspects of the questions involved. To review them would extend the opinion unduly. In general, it is sufficient to state that they

indicate an overwhelming weight of authority in accord with our own decisions to the effect that maintenance grants to charitable institutions for a public purpose are valid. *Hager* v. *Kentucky Children's Home Society*, 119 Ky. 235, 83 S. W. 605, long referred to as a leading case, involved the constitutionality of an annual grant by the legislature to the defendant, a charitable corporation. In sustaining its constitutionality, the court stated the principles governing the application of the constitutional provision in these words (p. 246): "These authorities clearly settle that the vital point in all such appropriations is whether the purpose is public; and that, if it is, it does not matter whether the agency through which it is dispensed is public or is not; that the appropriation is not made for the agency, but for the object which it serves; the test is in the end, not in the means. The limitation put upon the State government by the people is as to what things it may collect taxes from them for, to which it may apply their property through taxation; not upon the means by which or through which it will do it." In that case, a provision in the appropriation requiring the society to provide a bond to insure the use of the full amount for the purpose declared in the society's charter was held sufficient assurance that the funds would be spent for the public purpose for which they were appropriated. The provision in § 3 of the bond act that any institution benefiting by an appropriation thereunder must be either "wholly or partially maintained by the state" or "under the supervision of an agency thereof" gives adequate assurance of this result under the section here in question.

A more recent Kentucky case, *Kentucky Building Commission* v. *Effron*, 310 Ky. 355, 220 S. W. 2d 836, decided in 1949, reiterates the principles quoted above and is particularly helpful, for it relates to an appropria-

tion for the new construction of certain nonprofit charitable hospitals neither owned nor operated by the state. In sustaining its constitutionality, the court stated (p. 358): "It is clear that sec. 3 of the Kentucky Constitution (no exclusive grant of public emoluments or privileges shall be made except in consideration of public services) has no application to the question before us, since the construction of nonprofit hospital facilities is a public purpose. . . . It is well settled that a private agency may be utilized as the pipe-line through which a public expenditure is made, the test being not who receives the money, but the character of the use for which it is expended. . . . Since the construction of these nonprofit hospitals is for the common good of all people throughout the State, the appropriations of tax money for building them do not violate the applicable part of sec. 171 of our Constitution—'Taxes shall be levied and collected for public purposes only.' " The fact that § 3 of the Kentucky constitution is couched in different language from § 1 of article first of the Connecticut constitution is not operative to differentiate the decision reached by the Kentucky court, in view of the language quoted above from our opinion in *Stamford Jewish Center, Inc.* v. *Stamford*, 117 Conn. 379, 383, 168 A. 5. Another case in which the court sustained a bond issue and appropriation by a city to a private charitable hospital, to be used for the erection of buildings and for additions and improvements, is *Finan* v. *Mayor & City Council of Cumberland*, 154 Md. 563, 141 A. 269. Other cases sustaining appropriations to nonprofit charitable hospitals not owned by the state to pay for the construction of buildings are: *Craig* v. *North Mississippi Community Hospital*, 206 Miss. 11, 39 So. 2d 523; *Craig* v. *Mercy Hospital-Street Memorial*, 209 Miss. 427, 45 So. 2d 809, 47 So. 2d 867; *Parker* v. *Bates*, 216 S. C. 52, 56 S. E. 2d 723.

It is our conclusion that upon principle and authority, in so far as the New Britain Memorial Hospital is concerned, neither § 3 of the bond act nor what was done pursuant to it with relation to the contract with the hospital is violative of § 1 of article first of the constitution. We further conclude that in view of the facts pertaining to the purpose, organization, function and operation of all the institutions upon the property of which it is planned and intended that institutional buildings will be erected and capital improvements will be made by the state, as recited earlier in this opinion, neither § 3 nor the contemplated acts alleged with relation thereto are violative of § 1 of article first of the constitution. Our reasons sufficiently appear in the foregoing discussion.

A further question presented by supplemental stipulations requires us to determine whether the committee created under § 2859 is still empowered to perform the functions delegated to it under § 1 of the bond act. This section provides in part: "The treasurer is directed, subject to the approval of the committee established under section 2859 of the general statutes, to issue bonds of this state to an amount not exceeding seventeen million dollars, to be denominated on the face thereof 'Institutional Building Bonds of the state of Connecticut.' Such bonds shall be issued at such times and in such amounts as may be determined by the committee." 25 Spec. Laws 1408. As already recited, the committee on March 23, 1950, in anticipation of the issuance of $3,000,000 in bonds with its approval pursuant to this section, under § 3 of the bond act, through the state agency duly authorized, allotted $3,000,000 for the expansion of the New Britain Memorial Hospital, but no bonds have been issued to provide the sum so allotted. On October 5, 1950, the committee approved the issuance of bonds in the amount of $7,000,000 and allocated

the proceeds to capital improvements on state institutions. No part of this was allocated to the New Britain Memorial Hospital. On January 3, 1951, Public Act No. 4 of the March, 1950, special session, establishing a public works department, became effective; § 18 of the act expressly repealed § 2859. This legislation could not affect acts done before the date of repeal. Whether, as to bonds not yet approved, the repeal of § 2859 is operative to eliminate or otherwise affect the provision in § 1 of the bond act requiring approval by the committee established under § 2859 of the bonds to be issued and determination by it of the times and amounts of such issue is the question which underlies the second, third and fourth questions reserved.

Answer is found in the thoroughly established principle of statutory construction which has been thus summarized: "As a general rule, the subsequent modification or repeal of a statutory provision adopted by another statute through incorporation by reference is inoperative so far as the adopting statute is concerned, in the absence of express or implied legislative intent to the contrary. Where a particular statute is incorporated into another statute by specific or descriptive words, the presumption is that the legislature did not intend that modification or repeal of the adopted statute should affect the adopting statute." Note, 168 A. L. R. 627, 636. Of the great number of authorities which could be cited to substantiate this proposition, we mention only a few. In these, the reason given is that, subject to the qualification discussed in the next paragraph, the adoption of a statute by specific reference is an adoption of the law as it existed at the time the adopting statute was passed, and the adopting statute is therefore not affected by any subsequent modification or repeal of the statute adopted. Thus, the Supreme Court of the United States as early as 1838 stated: "And

such adoption has always been considered as referring to the law existing at the time of adoption; and no subsequent legislation has ever been supposed to affect it. And such must necessarily be the effect and operation of such adoption. No other rule would furnish any certainty as to what was the law; and would be adopting prospectively, all changes that might be made in the law." *Kendall* v. *United States*, 12 Pet. (37 U. S.) 524, 625, 9 L. Ed. 1181. To the same effect are: *United States ex rel. Kessler* v. *Mercur Corporation*, 83 F. 2d 178, 180; *Commonwealth* v. *Kendall*, 144 Mass. 357, 11 N. E. 425; *Collins* v. *Blake*, 79 Me. 218, 9 A. 358; *Shull* v. *Barton*, 58 Neb. 741, 79 N. W. 732; *Kloss* v. *Suburban Cook County Sanitarium*, 404 Ill. 87, 94, 88 N. E. 2d 89; *Palermo* v. *Stockton Theatres, Inc.*, 32 Cal. 2d 53, 58, 195 P. 2d 1; 50 Am. Jur. 58, § 39; 59 C. J. 937, § 548.

However, as is suggested in the first sentence of the first quotation in the preceding paragraph, the presumption that the legislature did not intend that modification or repeal of the adopted statute should affect the adopting statute does not prevail where either an express or implied intention to the contrary clearly appears. Among cases so holding are *Ramish* v. *Hartwell*, 126 Cal. 443, 446, 58 P. 920; *Vallejo & N. R. Co.* v. *Reed Orchard Co.*, 177 Cal. 249, 254, 170 P. 426; and *Haas* v. *Commissioners of Lincoln Park*, 339 Ill. 491, 500, 171 N. E. 526. See note, 168 A. L. R. 630. Such intention may appear as incident to the passage of the adopting statute. *Vallejo & N. R. Co.* v. *Reed Orchard Co.*, supra; *Ramish* v. *Hartwell*, supra; *Haas* v. *Commissioners of Lincoln Park*, supra. Or it may appear in the enactment of the statute modifying or repealing the adopted statute. *State ex rel. Washington-Oregon Investment Co.* v. *Dobson*, 169 Ore. 546, 551, 130 P. 2d 939; *Martin* v. *Stumbo*, 282 Ky. 793, 797, 140 S. W. 2d 405; *O'Flynn* v. *Village of East Rochester*, 292 N. Y.

156, 161, 54 N. E. 2d 343. In ascertaining whether such a contrary intention has affected the validity of the incorporation of § 2859 into § 1 of the bond act, it must be remembered that where, as here, the adopting *statute is one of specific reference*, only the appropriate parts of the statute referred to are taken. 2 Sutherland, Statutory Construction (3d Ed.) p. 549; *State* v. *Board of County Commissioners*, 83 Kan. 199, 203, 110 P. 92. The concrete question, therefore, is whether the incorporation by reference into § 1 of the bond act of so much of § 2859 as was necessary to designate the committee referred to continues as a part of the former, notwithstanding the subsequent repeal of the latter, for lack of express or implied intention to the contrary either in the adoption of § 1 of the bond act or in the repeal of § 2859 by § 18 of the act establishing a public works department.

No such express intention is to be found in either of the sections mentioned. Certainly no such implied intention appears in connection with the adoption of § 1 of the bond act. Its manifest purpose was to entrust the power of approving and of determining the amounts and times of issue of the very large total amount of bonds provided for to the chief executive of the state and the two other members of the state government who, by virtue of their respective positions and responsibilities, presumably would prove best qualified to deal with the proper utilization of the amounts to be realized to meet the state's needs. There can be no implication that upon the adoption of § 1 of the bond act there was any legislative intention that the control so established was not to continue until all of the bonds were issued. The need for this control will continue until this has been accomplished. As appears from its content, the act establishing a public works department provides primarily for the management of construction of capital

improvements of the state and for the care and control of state buildings in Hartford. It does not vest in the public works department the power to determine what new capital expenditures are needed, which is the function of the committee under § 1 of the bond act. It not only provides no substitute for the control established by § 1 of the bond act but contains nothing to indicate that the legislature contemplated any change in such control. The adoption of § 18 of the act establishing a public works department involved no implied legislative intent to affect the incorporation by reference of § 2859 into § 1 of the bond act. It is our conclusion that the repeal of § 2859 was not operative to eliminate or otherwise affect the incorporation by reference of § 2859 into § 1 of the bond act. For identical reasons the same holds true as to § 3 of the bond act, which provides that the proceeds "be used under the direction of said committee."

To the first question in the reservation we answer that the acts therein recited do not constitute a violation of article first, § 1, of the constitution of this state as an expenditure of public funds for private purposes. To the second question we answer "Yes." To the fourth question we answer "No." The third question requires no answer.

No costs will be taxed in this court to either party.
In this opinion the other judges concurred.