STATE OF CONNECTICUT *v.* IVAN M. SCHAFFEL

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CR 6-31068

Argued September 12—decided December 16, 1966

*Alfonse C. Fasano,* of New Haven, for the appellant (defendant).

*Herbert R. Scott,* special assistant prosecuting attorney, and *Joseph B. Clark,* assistant prosecuting attorney, for the appellee (state).

JACOBS, J.  The defendant is the owner of a tenement house building, as defined by § 19-342 (1) of

the General Statutes, erected some sixty years ago in the city of New Haven and still used as a tenement house. The building contains six separate apartments, three of which are located on the left-hand side of the building and are known as 25 Redfield Street, and three of which are located on the right-hand side of the building and are referred to as 23 Redfield Street. Each apartment is identical in size; each contains a living room, three bedrooms, a kitchen and a bathroom. The rental for a heated apartment is fixed by lease at $95 a month.

Sometime during the month of January, 1964, one of the tenants in the building, Pauline Byrd, who had leased an apartment from the defendant in September, 1963, at 25 Redfield Street, telephoned a complaint to the division of neighborhood improvement of the New Haven redevelopment agency concerning alleged violations in her apartment of the housing code of the city. Within a few days after the receipt of the complaint, Edward DeLouise, director of the division of neighborhood improvement and charged with the responsibility of enforcing the housing code in certain defined areas, within which the defendant's property fell, sent two accredited representatives of his office to inspect the apartment occupied by the Byrd family. After they had properly identified themselves and announced the purpose of their visit, they were admitted and made the inspection. A list of probable violations were noted. In March, 1964, Pauline Byrd called the division of neighborhood improvement and made another complaint. Again the inspectors were invited in and noted probable violations. The inspectors then proceeded to other apartments in the building and, after identifying themselves and their purpose, were invited to enter; again, they noted probable violations. They proceeded to make an inspection of the common hall-

ways and stairways, noting probable violations thereon. The inspectors returned to the division of neighborhood improvement and filed their report with the director.

After reviewing the report, the director made a determination that there were probable grounds to believe that the defendant's property was in violation of the housing code. The probable violations were reduced to writing. The director, in an order dated September 18, 1964, notified the defendant by registered mail "to undertake . . . remedial action for the correction of these violations. Such work to be completed by December 18, 1964." The defendant failed to comply with the terms of the notice; he chose not to avail himself of a hearing before the code enforcement committee, where opportunity is afforded a person affected by such a notice to show cause why it should be modified, extended, withdrawn or varied.[1] The defendant's noncompliance with the notice and failure to exhaust his administrative remedies left the director with no alternative but to refer the matter to the prosecuting attorney of the Circuit Court. Thereafter, the prosecuting attorney instituted criminal proceedings under the penalty provisions (¶ 102) of the code. The defendant, in a seven-count amended information,[2] was

---

[1] Under the housing code of the city of New Haven (1954), as amended September 10, 1962, a code enforcement committee is created (¶ 201), and "[a]ny person affected by any notice which has been issued in connection with the enforcement of any provisions of this Title may request and upon the payment of a ten dollar fee . . . shall be granted a hearing . . . before the code enforcement committee . . . ." ¶ 203 (a). "At such hearing the petitioner shall be given an opportunity to be heard and to show why such notice should be modified, extended or withdrawn or a variance granted." ¶ 203 (c).

[2] The first count charged the defendant with a violation of ¶ 302 (g) in failing "to correct condition causing exterior wood surface throughout to be adequately protected from decay." The second count charged violations of ¶ 302 (a) in failing to correct conditions to "exterior and public areas"; in failing to repair or

charged with a variety of violations of the Housing Code of the city of New Haven. The jury returned a verdict of guilty on all counts; the court, however, on motion, set aside the verdict as to the seventh count. Judgment was thereupon rendered on the verdict.

On appeal to the Appellate Division, the defendant has raised many questions; these may be reduced to five: (1) Whether the housing code is a valid exercise of the police power, that is, whether the standards of the code are arbitrary, unreasonable and unrelated to public health, safety and welfare; (2) whether the housing code is null and void because it delegates enforcing authority to the director of the division of neighborhood improvement of the New Haven redevelopment agency in substandard, middle ground and urban renewal areas rather than to the director of public health, who is made the enforcing officer under the code for other areas of the city; (3) whether the city of New Haven possesses authority to establish a monetary fine of $100 for a violation of the code; (4) whether the housing code is unconstitutional as ex post facto legislation; and (5) whether the defendant's fourth amendment rights to be secure in his home and

correct conditions to "interior dwelling unit (1st floor, right)"; in failing to repair "interior dwelling unit (1st floor, left)"; and in failing to correct or repair conditions in "interior dwelling unit (2nd floor, right)"; the third count charged violations of ¶ 302 (h) affecting "exterior and public areas," "interior dwelling unit (1st floor, right)," "interior dwelling unit (2nd floor, left)," and "interior dwelling unit (3rd floor, right)"; the fourth count charged violations of ¶ 301 (d) in failing to correct conditions causing insufficient and inadequate electrical outlets in all six apartments; the fifth count charged violations of ¶ 300 (b) in failing to instal lavatory basins in all six apartments; the sixth count charged violations of ¶ 302 (b) in failing to correct conditions causing loose window frames, deteriorated window frames and sashes, and missing glass in all the apartments; and the seventh count charged violations of ¶ 309 in failing to correct conditions causing vermin and rodent infestation in the apartments.

effects from unreasonable searches and seizures constitute a bar to his conviction on the ground that evidence was obtained through an inspection of his premises at the request of his tenants over his objection.

An initial question we must decide is whether the housing code of the city of New Haven is a valid exercise of the power granted to municipalities under appropriate statutory authority. That there is a great need in this country for housing codes was recognized by Mr. Justice Frankfurter in *Frank v. Maryland,* 359 U.S. 360, 371, where he put the problem in this way: "The need to maintain basic, minimal standards of housing, to prevent the spread of disease and of that pervasive breakdown in the fiber of a people which is produced by slums and the absence of the barest essentials of civilized living, has mounted to a major concern of American government. The growth of cities, the crowding of populations, the increased awareness of the responsibility of the state for the living conditions of its citizens, all have combined to create problems of the enforcement of minimum standards . . . ." The need for legislation in this area of government does not stem only from public health; it is also a social and economic need. "The toll exacted by slums and blight has been too frequently recorded. As if by rote, social workers, health officers, and public officials recite the fearful consequences in terms of blighted lives, disease, crime, juvenile delinquency, and hazards to health, safety and morals. The hard truth regarding these consequences, even when supported by cold statistics, may not penetrate the consciousness of one as effectively as an actual inspection of slums . . . . Equally disturbing to the tranquillity of the thinking citizen is the effect of urban blight on the economic life of the community. The spread of blight rapidly depreciates property

values and at the same time imposes upon the city government more onerous burdens for the provision of municipal services and public facilities. The city's ability to finance these expanding needs is impaired by urban blight in that taxes are lowered as properties deteriorate. The exodus of higher economic groups to the suburbs and the influx into the declining central areas of lower income groups, generally racial minority groups, impose additional strain upon the municipal economy." Guandolo, "Housing Codes in Urban Renewal," 25 Geo. Wash. L. Rev. 1, 2. Housing codes are necessary for another reason. "[C]learance and rehabilitation programs involve large expenditures of money and manpower; they are appropriate for, and normally limited to, highly deteriorated neighborhoods . . . . Consequently, code enforcement remains the principal method by which cities can ensure that minimum housing conditions are maintained. Through periodic inspection of all residential property, code enforcement attempts to detect and prevent deterioration, thereby obviating the need for more drastic programs." Comment, "Enforcement of Municipal Housing Codes," 78 Harv. L. Rev. 801, 803.

Connecticut, as well as other states, has recognized the need for municipal housing codes.[3] Allocation of authority may be found in a number of our statutes.[4] Basically, the housing code of the city of New Haven prescribes minimum conditions under which buildings may be lawfully occupied as dwellings or dwelling units. Within this concept of essential requirements for health, safety and public

---

[3] Comment, "Municipal Housing Codes," 69 Harv. L. Rev. 1115, 1116-17.

[4] Ample statutory authorization for the enactment of a municipal housing code may be found in General Statutes, title 8, chapter 130 part II, entitled "Urban Renewal," particularly §§ 8-141, 8-143, 8-144 and 8-145; see title 7, "Municipalities," particularly §§ 7-148, 7-194 (26), (29), (37), (40), (41), (44) and (45).

welfare, the code provides minimum standards of required basic sanitary and heating facilities and equipment, light and ventilation, construction and repair, and safe and sanitary maintenance of the buildings. Thus, the housing code of the city of New Haven is a self-defining term; it is merely the enforcement of a municipal code which applies to housing. The program envisioned by the code, generally speaking, is designed to encourage owners as well as tenants to repair, to refurnish, and to keep the buildings from becoming dilapidated, unsafe, dangerous, unhygienic or unsanitary. The code also provides sanctions to compel recalcitrants to comply with minimum standards.

We hold that the New Haven housing code is a lawful and proper exercise of the police power. It may be invalidated only where the means to achieve its goals are unreasonable, discriminatory or arbitrary. *Connecticut Theatrical Corporation* v. *New Britain,* 147 Conn. 546, 553. Unless a clear violation of constitutionality is shown, the presumption of constitutionality must sustain the ordinance. *Amsel* v. *Brooks,* 141 Conn. 288, 294, appeal dismissed, 348 U.S. 880; *Schwartz* v. *Kelly,* 140 Conn. 176, 179. If any reasonable ground to uphold the ordinance exists, especially where, as here, the apparent aim of the ordinance is to serve the general welfare, courts will assume that the legislative body intended to place it upon that ground and was not motivated by some improper purpose. *State* v. *Gordon,* 143 Conn. 698, 703; *Legat* v. *Adorno,* 138 Conn. 134, 145; *Lyman* v. *Adorno,* 133 Conn. 511, 514. We do not pass upon whether the legislation is wise or is the best remedy; these questions are primarily for legislative, not judicial, consideration. *Shelton* v. *City of Shelton,* 111 Conn. 433, 449.

The defendant also questions the reasonableness of the standards as fixed by the board of aldermen

and enforced by the director of the division of neighborhood improvement. Individual hardship must yield to the lawful exercise of the police power; it is not unreasonable to expect owners, especially those using their property commercially as landlords, to anticipate increased requirements. Moreover, economic loss alone, resulting from the enforcement of the legislation, will not invalidate the ordinance. *State* v. *Heller,* 123 Conn. 492, 496, appeal dismissed, 303 U.S. 627; *Tenement House Dept.* v. *Moeschen,* 179 N.Y. 325, aff'd per curiam, 203 U.S. 583. Mr. Justice Frankfurter has said that a loss due to a police power regulation "is properly treated as part of the burden of common citizenship." *Kimball Laundry Co.* v. *United States,* 338 U.S. 1, 5. The standards of the housing code are neither stringent nor without precedent. The code is based on the model code of the committee on hygiene and housing, a subcommittee of the American Public Health Association. See "A Proposed Housing Ordinance, Regulating Supplied Facilities, Maintenance, and Occupancy of Dwellings and Dwelling Units," American Public Health Assn. (1952). Substantially similar ordinances have been sustained in other jurisdictions. *Louisville* v. *Thompson,* 339 S.W.2d 869 (Ky. App.); *Givner* v. *Commissioner of Health,* 207 Md. 184; *Paquette* v. *Fall River,* 338 Mass. 368; *Dankner* v. *City of New York,* 20 Misc. 2d 557 (N.Y.); *DePass* v. *Spartanburg,* 234 S.C. 198; *Richards* v. *Columbia,* 227 S.C. 538; *Boden* v. *Milwaukee,* 8 Wis. 2d 318.

We next consider whether the board of aldermen in enacting the housing code may delegate enforcing authority to the director of the division of neighborhood improvement as well as to the director of public health. The defendant claims that the provisions of title 19 of the General Statutes, entitled

"Public Health and Safety," vest in the director of public health "absolute powers to deal with all matters pertaining to public health"; therefore, argues the defendant, since the director of the division of neighborhood improvement is not an expert in public health, any delegation of authority to him is violative of the statutes. By focusing attention solely on the health aspects of substandard housing, the defendant fails to take into account other attributes of the police power: public safety, morality and the general public welfare. *State* v. *Gordon,* 143 Conn. 698, 703; *Calve Bros. Co.* v. *Norwalk,* 143 Conn. 609, 616; *Amsel* v. *Brooks,* 141 Conn. 288, 294, appeal dismissed, 348 U.S. 880; *Corthouts* v. *Newington,* 140 Conn. 284, 288. Realization of public health is not the only goal to be achieved by the ordinance; public safety and general welfare are also legitimate objectives of police power. No valid reason appears, and none has been suggested, why the director of public health is necessarily the only person to administer the ordinance; he is not even deemed to be the exclusive administrator under § 19-347[5] or § 19-372[6] of the General Statutes. We fail to comprehend the need for medical expertise where minimum standards have been established by the legislative body. In our view, the director of the division of neighborhood improvement is as well equipped to further the public safety and the general welfare as the director of public health. We

---

[5] Section 19-347, the enforcement and penalty provision of title 19, chapter 352, "Tenement and Lodging Houses," part I, confers enforcing power upon the board of health of a municipality; however, it is further provided that "[n]othing in this part shall be construed to abrogate or impair the powers of a local board of health, or of the courts, or any other lawful authority, to enforce any provision of any city or borough charter or health ordinances and regulations not inconsistent with this part, or to prevent or punish for violations thereof."

[6] Section 19-372 confers enforcing power upon the local department of health, the fire department, the courts or "any other lawful authority."

are of the opinion that it is not arbitrary, discriminatory or unreasonable for the director of the division of neighborhood improvement to administer the housing code in substandard, middle ground or urban renewal areas.

The defendant also questions the authority of the board of aldermen to enact legislation providing for a fine of not more than $100 for failure to comply with its provisions. New Haven Housing Code ¶ 102. The short answer may be found in § 7-148 of the General Statutes, which empowers a municipality to impose fines not to exceed $100 for the violation of any ordinance made under the provisions of chapter 98, entitled "Municipal Ordinances and Regulations."

The claim is also made and pressed upon us that the housing code has a retroactive impact upon the defendant; therefore, he argues, the ordinance must fail as ex post facto legislation. But mere ownership of substandard housing is not made a crime under the code. What is prohibited by the ordinance is the occupation, or letting to another for occupation of premises falling below minimum standards. The Supreme Court of the United States has addressed itself to the precise issue now raised; the court held that a housing code may constitutionally be applied to structures erected in compliance with earlier standards. "[I]n no case does the owner of property acquire immunity against exercise of the police power because he constructed it in full compliance with the existing laws." *Queenside Hills Realty Co.* v. *Saxl,* 328 U.S. 80, 83. The ordinance is not null and void as ex post facto legislation.

By far the most significant question which the defendant raised is whether his fourth amendment rights, made applicable to the states by the four-

teenth amendment, to be secure in his house and effects from unreasonable searches and seizures preclude conviction for violations of the housing code where, as here, he is the landlord, is not in occupancy, and objects to the entry and inspection. This, in turn, implicates the preliminary issue whether the defendant has standing to raise the constitutionality of the search. The parties obliquely touched upon the issue; the problem, however it may be put in issue, exists nonetheless, although there is no clear solution. There is some support for the contention that an owner of property not in possession or control has no standing to raise the constitutional question in a federal court. *United States* v. *Reiburn,* 127 F.2d 525, 526; *Schnitzer* v. *United States,* 77 F.2d 233, 235; *United States* v. *Muscarelle,* 63 F.2d 806; *Connolly* v. *Medalie,* 58 F.2d 629, 630; *Nunes* v. *United States,* 23 F.2d 905, 906; *Rosenberg* v. *United States,* 15 F.2d 179, 180; *Rouda* v. *United States,* 10 F.2d 916, 918; *Driskill* v. *United States,* 281 F. 146, 147; see Weeks, "Standing to Object in the Field of Search and Seizure," 6 Ariz. L. Rev. 65, 75; notes, 96 L. Ed. 66, 70, 78 A.L.R.2d 246, 255. By virtue of his ownership in the demised premises and because the search was directed against him, the defendant has standing to raise the constitutional issue.[7]

Of course, the determination of what constitutes a reasonable search is to be made in the light of the facts and circumstances of each case as well as

---

[7] Distinctions such as those between "lessee, licensee, invitee and guest" have been deemed too insubstantial to be relied upon as the basis of determining an interest in the searched premises requisite to maintain a motion to suppress. *Jones* v. *United States,* 362 U.S. 257, 266; 47 Am. Jur., Searches and Seizures, § 12 (Sup. 1966, p. 68). Ownership or right to possession qualified as a sufficient quantum of proof of interest in the property searched to provide standing; however, as the quantum of such interest decreases, the problem increases in difficulty. Notes, 74 Harv. L. Rev. 151, 59 Mich. L. Rev. 444, 14 Vand. L. Rev. 418.

the fundamental criteria of the fourth amendment. *Mapp* v. *Ohio,* 367 U.S. 643, 653; *Ker* v. *California,* 374 U.S. 23, 24; *Sartain* v. *United States,* 303 F.2d 859, cert. denied, 371 U.S. 894. The end to be protected when a person claims his fourth amendment rights, rather than his fifth amendment privilege, is the right of privacy. The defendant, in his brief, specifically invokes "the security of [his] privacy against arbitrary intrusions by the police which is at the core of the fourth amendment." The Supreme Court of the United States, in discussing the fourth amendment provisions in *Jones* v. *United States,* 362 U.S. 257, 261, said: "The restrictions upon searches and seizures were obviously designed for protection against official invasion of privacy and the security of property. They are not exclusionary provisions against the admission of kinds of evidence deemed inherently unreliable or prejudicial. The exclusion in federal trials [now made applicable to state trials by *Mapp* v. *Ohio,* supra] of evidence otherwise competent but gathered by federal officials in violation of the Fourth Amendment is a means for making effective the protection of privacy." See *Frank* v. *Maryland,* 359 U.S. 360, 365; *Mapp* v. *Ohio,* supra, 655; *Griswold* v. *Connecticut,* 381 U.S. 479; Beaney, "The Constitutional Right to Privacy in the Supreme Court," in [1962] Supreme Court Review, p. 212; Griswold, "The Right to Be Let Alone," 55 Nw. U.L. Rev. 216.

We turn now to the case at bar. Who may claim the right of privacy? Who has the right of possession and control which furnishes the basis for a claim of privacy?

The tenant acquires from his landlord, unless the lease otherwise provides, exclusive possession and control of the leased premises and, as incidental thereto, the parts of the structure which form an

integral part of the tenement. *Bentley* v. *Dynarski,* 150 Conn. 147, 150; *Martel* v. *Malone,* 138 Conn. 385, 389; *Central Coat, Apron & Linen Service, Inc.* v. *Indemnity Ins. Co.,* 136 Conn. 234, 237; *Aprile* v. *Colonial Trust Co.,* 118 Conn. 573, 579. "The tenant is entitled to exclusive possession as against the landlord and all others not having a superior legal or equitable right. A lessor retains, as a rule, no rights over premises demised by him, except such as are reserved to him by the lease in clear and express terms." 51 C.J.S. 972, Landlord and Tenant, § 311. "[O]ne who is the tenant of land under another has the possession of the land, unless he has divested himself of the possession by creating a subtenancy . . . . Possession involves not only the exercise of acts of ownership over the land but also the exclusion of the exercise of such acts by others." 1 Tiffany, Landlord and Tenant § 3. Under the terms of the lease in the present case, the landlord was entitled to possession only upon breach of one or more of the covenants contained in the lease, and then only upon reentry or by statutory summary process. The landlord has not reentered or acted by summary process. Moreover, under the terms of the lease, the landlord's right of entry was limited to two specific purposes: (1) "for the purpose of inspection," and (2) "to see that the covenants on the part of the tenant are being kept and performed." It must follow, therefore, that the tenant retained control and possession of the demised premises.

The implication which necessarily flows from the tenant's control and possession is that it is the tenant, not the landlord, who has the final word as to the person or persons who may enter upon the demised premises. The landlord has neither the power of exclusion nor the power of selection. To be sure, he may enter for the avowed purpose of

inspection and supervision. But this is far from control. Said Lord Atkinson: "[T]he power of control . . . implies something more than the right or liability to repair the premises. It implies the power and the right to admit people to the premises and to exclude people from them. But this power and this right belong to the tenant, not to the landlord . . . ." *Cavalier* v. *Pope*, [1906] A.C. 428, 433; see *Williams* v. *Lubbering*, 73 N.J.L. 317; *Federal Waste Paper Corporation* v. *Garment Center Capitol, Inc.*, 268 App. Div. 230, aff'd, 294 N.Y. 714; *Eagle Spring Water Co.* v. *Webb & Knapp, Inc.*, 236 N.Y.S.2d 266; *Reek* v. *Lutz*, 90 R.I. 340; *Konick* v. *Champneys*, 108 Wash. 35; 32 Am. Jur., Landlord and Tenant, §§ 171, 200; notes, 6 A.L.R. 465, 43 A.L.R. 206.

The defendant insists that the inspectors were trespassers. He defines, without benefit of authority, a trespasser as "[a]nyone who entered the premises through the common approaches to the building, other than the tenant or at the invitation of the tenant." But the inspectors here entered the leased apartment in response to a reported telephoned complaint initiated by a tenant. Other tenants in the building invited the inspectors into their apartments after the inspectors identified themselves and announced the purpose of their mission. They left by means of the common areas, where they had a right to be, as lawful guests of the tenants. See *Driskill* v. *United States*, 281 F. 146, 147. Not only did the tenants have the right to invite the inspectors upon the premises but they had a statutory duty to do so. The New Haven housing code, ¶ 200, provides: "The owner or occupant of every dwelling, dwelling unit, and rooming unit, or the person in charge thereof, shall give the enforcing officer free access to such dwellings, dwelling unit or rooming unit and its premises, at

all reasonable times for the purpose of such inspection, examination, and survey." Had the tenants failed to admit the inspectors, they would have been subject to criminal penalties under ¶ 102 of the housing code. We conclude that the inspectors were lawfully on the premises.

The defendant also raised the question of the impropriety of the inspection because it was made without a search warrant. The proceedings which led to the defendant's conviction did not commence as prosecutorial; originally, only an administrative inspection was involved. The purpose of the inspection was to encourage compliance with the housing code. The aim was preventive, not prosecutorial. Indeed, the power of inspection is a sine qua non to the success of the housing code. "Time and experience have forcefully taught that the power to inspect dwelling places, either as a matter of systematic area-by-area search or, as here, to treat a specific problem, is of indispensable importance to the maintenance of community health; a power that would be greatly hobbled by the blanket requirement of the safeguards necessary for a search of evidence of criminal acts. The need for preventive action is great, and city after city has seen this need and granted the power of inspection to its health officials; and these inspections are apparently welcomed by all but an insignificant few." *Frank* v. *Maryland,* 359 U.S. 360, 372; comment, "Administrative Inspections and the Fourth Amendment, A Rationale." 65 Colum. L. Rev. 288, 291; Sogg & Wertheimer, "Urban Renewal: Problems of Eliminating and Preventing Urban Deterioration," 72 Harv. L. Rev. 504, 545; Stahl & Kuhn, "Inspections and the Fourth Amendment," 11 U. Pitt. L. Rev. 256, 267-71, 273-76. In *Frank,* Mr. Justice Frankfurter made a distinction between a criminal proceeding and an administrative inspection, even

though disobedience to an administrative order may subsequently lead to criminal prosecution. "Inspection without a warrant," he continued (p. 367), "as an adjunct to a regulatory scheme for the general welfare of the community and not as a means of enforcing the criminal law, has antecedents deep in our history." In the instant case, as in *Frank,* there were reasonable grounds to believe that violations existed; indeed, as we have pointed out, the tenant actively sought the inspection. The inspections were made during reasonable hours; there was no forcible entry; nor was the manner objectionable in which the inspections were made. It is our conclusion, based upon the facts of this case as we have recited them, that no search warrant was required in an administrative inspection of premises made with the acquiescence of the tenants.

The defendant also makes the claim that, since he did not consent to the search of his property, evidence gathered by means of the inspection may not be used in criminal proceedings instituted against him. Courts, however, have upheld a search consented to by one other than the defendant where the other has possession of or control over or equal rights in the premises or objects searched. The question turns on the relationship which the consenter and nonconsenter have in the searched objects or effects.

Consent is valid where given by one in possession and control. Thus, assent to a search by one business partner may bind the other. *United States* v. *Sferas,* 210 F.2d 69, cert. denied, 347 U.S. 935. "Where the husband and wife are equally in control and management of the premises, a search of the premises may be made by consent of either." 79 C.J.S. 824, Searches and Seizures, § 62; *United States* v. *Pugliese,* 153 F.2d 497; *United States* v. *Heine,* 149 F.2d 485; *United States* v. *Sergio,* 21 F.

Sup. 553; *People* v. *Carter,* 48 Cal. 2d 737; *People* v. *Perroni,* 14 Ill. 2d 581, cert. denied, 359 U.S. 980; *Bellam* v. *State,* 233 Md. 368; *State* v. *Cairo,* 74 R.I. 377. It has been held that authorization of one occupant may bind other joint occupants. 79 C.J.S., Searches and Seizures, § 62 (d); see *United States* v. *Walker,* 190 F.2d 481, cert. denied, 342 U.S. 868; *Stein* v. *United States,* 166 F.2d 851, cert. denied, 334 U.S. 844 (living together as man and wife); *Driskill* v. *United States,* 281 F. 146; *People* v. *Banks,* 238 Cal. App. 2d 43; *People* v. *Howard,* 166 Cal. App. 2d 638; *People* v. *Harvey,* 48 Ill. App. 2d 261; *State* v. *Cairo,* 74 R.I. 377. A relative may waive the constitutional right of his kin. *Maxwell* v. *Stephens,* 348 F.2d 325, 337, cert. denied, 382 U.S. 944; *Rees* v. *Peyton,* 341 F.2d 859, 862, remanded on other grounds, 384 U.S. 312; *Woodard* v. *United States,* 254 F.2d 312, cert. denied, 357 U.S. 930; *McCray* v. *State,* 236 Md. 9; *State* v. *Kinderman,* 271 Minn. 405, cert. denied, 384 U.S. 909; *Commonwealth* v. *McKenna,* 202 Pa. Super. 360. A gratuitous bailee may bind his bailor. *Sartain* v. *United States,* 303 F.2d 859, cert. denied, 371 U.S. 894; *United States* v. *Eldridge,* 302 F.2d 463. And a tenant may bind his lessor. *People* v. *Palmer,* 26 Ill. 2d 464, cert. denied, 373 U.S. 951; *Dyer* v. *State,* 61 Okla. Crim. 202; *Vejih* v. *State,* 185 Wis. 21. Possession and control give an individual sufficient interest in the privacy of the premises to validate his consent. See White, "Effective Consent to Search and Seizure," 113 U. Pa. L. Rev. 260, 273; note, 70 Dick. L. Rev. 510, 523; cf. *State* v. *Griswold,* 67 Conn. 290 (servant and agent in possession of business office could bind defendant); *People* v. *Misquez,* 152 Cal. App. 2d 471 (babysitter with key could bind defendant); *People* v. *Carswell,* 149 Cal. App. 2d 395 (painter could not effectively consent to a search).

We hold that the evidence gathered by the inspectors who came upon the leased premises at the invitation of the tenants is admissible over the objection of the landlord, who was not in occupancy. In reaching the decision whether the inspection constituted a reasonable search in the light of all the surrounding circumstances, we have examined the extent, if any, to which the defendant's right of privacy was invaded. We conclude that no right of his privacy was invaded; moreover, when we consider the justification for the entry and the manner in which the search was effected, we hold that no search warrant was required in this case.

There is no error.

In this opinion DEARINGTON and KINMONTH, Js., concurred.